FILED
United States Court of Appeals
Tenth Circuit

December 18, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff-Appellee,

v.

BRUCE M. JONES, II,

　　　　Defendant-Appellant.

No. 11-3104

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:10-CR-20004-JWL-1)**

---

Phillip R. Gibson, Thompson & Gibson, LLC, Blue Springs, MO, for Defendant-Appellant.

Terra D. Morehead, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with her on the brief), Kansas City, KS for Plaintiff-Appellee.

---

Before **HARTZ** and **HOLMES,** Circuit Judges, and **EAGAN**,* Chief District Judge.

---

**HOLMES**, Circuit Judge.

---

　　　　Defendant-Appellant Bruce M. Jones, II appeals from a district court's

---

*　　　　Honorable Claire V. Eagan, Chief Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

denial of his motion to suppress evidence. He sought to suppress all evidence that Kansas law enforcement obtained from searches of his residence and vehicle pursuant to search warrants issued by a Kansas state court, including an estimated 355 marijuana plants. Mr. Jones alleges that officers of the Missouri State Highway Patrol—who in these circumstances had no authority under Kansas law to operate in Kansas—violated his Fourth Amendment rights when the officers (a) engaged him in an accusatory conversation outside of his residence in Kansas City, Kansas, (b) later took his driver's license, and (c) then entered his residence without a warrant or consent.

Mr. Jones argues that the information that the Missouri officers garnered from their Fourth Amendment violations provided the essential foundation for the Kansas search warrants issued for his residence and vehicle. Without this tainted information, Mr. Jones avers, the warrants lack probable cause to support the searches. Accordingly, Mr. Jones contends that the district court erred in declining to suppress the evidence secured under the warrants. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's order denying Mr. Jones's motion to suppress and its resulting judgment.

**I**

The events leading to the seizure of drug evidence from Mr. Jones began when officers of the Missouri State Highway Patrol conducted surveillance of the "Grow Your Own Hydroponics" store ("Grow Your Own") in Kansas City,

2

Missouri. Sergeant Troy Blunt, unarmed and dressed in plain clothes, parked his unmarked pick-up truck approximately one and a half blocks away from Grow Your Own.[1] Assisting Sergeant Blunt that day were Trooper Evan Tyrrell and Corporal Andy Bell, who were in radio contact but parked several blocks away. Both Trooper Tyrrell and Corporal Bell were uniformed and driving marked

---

[1] The idea of surveilling hydroponics stores came about around 2003 when Sergeant Blunt, a long-time member of the Missouri State Highway Patrol's division of drug and crime control, saw and heard advertisements for Grow Your Own. Although the store's advertisements contained no reference to marijuana, Sergeant Blunt believed that, generally, hydroponics stores sold all the necessary components to grow marijuana. Accordingly, the highway patrol decided to set up covert surveillance on hydroponics stores in Missouri, including Grow Your Own.

Typically, surveillance was undertaken by anywhere from one to six officers employing a variety of surveillance techniques. During surveillance, at least one officer in an unmarked vehicle would wait near a store and observe customers entering and exiting. The officer or officers often would observe what the customers purchased, run their license plates to see where they resided, and (if appropriate) run their criminal histories.

Sometimes the highway patrol would follow customers as they left the store and "have a uniformed vehicle obtain probable cause to do a vehicle stop and then approach the subject, identify them[selves], and then sometimes ask for a consensual search of the residence, based upon how the car stop went." R., Vol. II, at 155 (Tr. of Mot. to Suppress Hr'g, held May 17, 2010) (Hr'g Test. of Troy Blunt). Sometimes the officers would follow a customer all the way to his or her residence. Once there, the highway patrol would then decide whether "to pull trash on this person" (presumably, search their trash receptacles) or approach them and do a "knock-and-talk." *Id.* at 156; s*ee, e.g.*, *United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006) ("[A] 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."). The highway patrol would only follow vehicles that had a Missouri registration and that the unit could identify as having an owner who was a Missouri resident. According to Sergeant Blunt, the surveillance program on these stores has resulted in well over 100 knock-and-talks, with a "vast majority" of those leading to "indoor marijuana grow[s]." R., Vol. II, at 159–60.

highway patrol vehicles.

Mr. Jones arrived at Grow Your Own. After he entered the store, Sergeant Blunt requested a computer check on the license plate of Mr. Jones's pick-up truck. The records indicated that the truck belonged to Mr. Jones. They also revealed that Mr. Jones resided at a Kansas City, *Missouri* address, that his driving privileges had been suspended in *Missouri*, and that he was on parole in *Missouri* for a prior drug offense.[2]

Later, Mr. Jones left the store carrying a white plastic sack with contents that Sergeant Blunt could not see. Mr. Jones got into his truck and left the area. Sergeant Blunt decided to follow Mr. Jones's truck while maintaining radio contact with Trooper Tyrrell and Corporal Bell, who followed several blocks behind. With the Missouri officers following surreptitiously, Mr. Jones drove from Grow Your Own in Kansas City, Missouri to his residence in Kansas City, *Kansas*. The drive to Mr. Jones's house took approximately thirty minutes and wound through residential streets. Sergeant Blunt testified that upon reaching Mr. Jones's residence, neither he, nor the other officers, knew that they had entered the State of Kansas.

Upon arriving at his residence in Kansas City, Kansas, Mr. Jones proceeded

---

[2]     Sergeant Blunt testified that prior to deciding whether he would follow Mr. Jones, the vehicle had already checked back to a Missouri address. However, Sergeant Blunt was not sure if he received all of Mr. Jones's criminal history prior to the decision to follow Mr. Jones.

to an alley that runs behind his residence and parked in front of a shed, which stood in a grassy area adjacent to the alley. The shed stood roughly thirty feet from the back door of his residence. After waiting for the other officers to arrive near the alley entrance, Sergeant Blunt pulled into the alley and parked his vehicle three to ten feet behind Mr. Jones's truck, with the other officers' vehicles following behind him. As Mr. Jones was getting out of his truck, Sergeant Blunt walked up along the driver's side of Mr. Jones's truck and leaned against the truck's bed, near the gas cap area. Trooper Tyrrell and Corporal Bell also exited their vehicles, eventually standing somewhere behind Sergeant Blunt.

Regarding his encounter with Mr. Jones, Sergeant Blunt testified as follows:

> Q. [T]ell me what occurred then as you approached him.
>
> A. I identified myself.
>
> Q. How did you do that?
>
> A. I walked up to him, said, I'm Sergeant Troy Blunt with the Missouri State Highway Patrol conducting a drug investigation, and I'm here for your marijuana plants.
>
> . . . .
>
> Q. Why d[id] you tell the defendant that, Sergeant Blunt?
>
> A. It covers several different areas. First of all, it immediately lets him know who I am and that I'm conducting a drug investigation and then what I'm there for.

5

Q. All right. In connection with your statement to him about why you were there, what reaction did you get from the defendant?

A. His head dropped and he said, "Oh, shit."

. . . .

Q. What happened next?

A. Based upon his reaction, that's why I used that approach like that, is to see what his visual reaction is to it, to continue the investigation. He kind of sticks his head back up and asks me how do I know he's got marijuana plants, and I said, "Because you said, 'Oh, shit,'" and we started laughing. So at that point in time I think I'm leaning on his truck with the right side of my body and my arms up over the bed of the truck.

Q. How would you characterize the encounter with the defendant that you had on this day?

A. At that point, very, very casual.

. . . .

Q. Have you had occasions where you've encountered individuals just like you did Mr. Jones and they have turned and walked into their house?

A. Yes.

. . . .

Q. What was [Mr. Jones's] reaction after that?

A. That of a man who is surrendering in a way, just kind of like you-got-me type.

R., Vol. II, at 187, 189–92; *see also id.*, Vol. I, at 117–118 (Dist. Ct. Mem. &

6

Order, filed June 15, 2010).

Within thirty seconds of initiating the conversation with Mr. Jones, Sergeant Blunt asked for Mr. Jones's identification. Mr. Jones handed his identification to Sergeant Blunt, who relayed it to Corporal Bell. Corporal Bell then walked back to his patrol vehicle to run Mr. Jones's license, and Trooper Tyrrell remained at Sergeant Blunt's side.

As Sergeant Blunt described, Mr. Jones then began to "divert [the officers] to another residence" by stating that "there's somebody else, and the plants are at their house, and he [did not] want to talk about them because he's scared of them." *Id.*, Vol. II, at 193. In a casual manner, Sergeant Blunt responded, "that's fine . . . but let's clear up what we have here today," and "let's make sure that there's none here at your house." *Id.*

Without explicitly saying so, Sergeant Blunt indicated that he wanted to search Mr. Jones's residence, and if Mr. Jones "cleared it up [the officers] would go on [their] way." *Id*. at 195. Sergeant Blunt never explicitly told Mr. Jones that he could refuse consent. Mr. Jones never told the officers that he did not want them to search his residence or otherwise openly refuse consent to a search of his residence. At some point during this portion of the conversation, Mr. Jones turned and began walking toward the back door of his residence.

Sergeant Blunt and Trooper Tyrrell followed. Once Sergeant Blunt reached within ten feet of the back door of the residence, he encountered "[a] very strong

7

odor of marijuana." *Id*.; *see also id*., Vol. I, at 119. Still following behind Mr. Jones, the officers then walked into a screened-in porch area.[3] Mr. Jones unlocked the back door to his residence and the men all entered the house.

Upon entering the house, Mr. Jones went through a kitchen to a main room and then turned to face the officers. Thereafter, Mr. Jones raised his hands with his palms up as if to signal that there was nothing for the officers to see. Sergeant Blunt testified about what happened next:

> [A]t that point in time I just kind of looked at him like, man, I can smell [marijuana], you know. This is just—it's [a] very strong odor, and let's just get this over with, you know. He just kind of drops his hands and reaches in his pocket and starts to pull out some keys, and he starts walking into the living room area and around a corner to where a door was shut, locked.

*Id*., Vol. II, at 199–200. Mr. Jones unlocked the door and stepped into another room. Once inside, Mr. Jones grabbed a "long gun," turned, and aimed it into Sergeant Blunt's midsection. Trooper Tyrrell was able to fire five or six rounds at Mr. Jones, wounding him. The officers then retreated to their vehicles outside.

Once outside, Corporal Bell radioed dispatch, relaying that the officers were located in Kansas City, Missouri. However, dispatch notified the officers that they were in fact in Kansas City, Kansas. The Kansas City, Kansas Police Department responded to the location and took command. Based upon statements

---

[3]    In the screened-in porch area, Sergeant Blunt noticed a "cellar-type door" with a new, very large lock. R., Vol. II, at 197. Sergeant Blunt testified that in his experience, a majority of "grow operations" are located in the basement of residences. *Id.*

taken from Sergeant Blunt, Corporal Bell, and Trooper Tyrrell, the Kansas City, Kansas Police Department applied for and received a search warrant to search Mr. Jones's residence, and later it obtained a second search warrant to search Mr. Jones's vehicle. The searches resulted in the seizure of evidence related to marijuana and firearms possession—which became the basis for the indictment in this case.

## II

Mr. Jones was indicted on one count of manufacturing marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii) (Count I), one count of brandishing a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (Count II), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count III). He filed a motion to suppress, arguing that all evidence obtained by law enforcement from Mr. Jones's home and truck, pursuant to the two search warrants issued by the Wyandotte County, Kansas District Court, should be suppressed because the information used in the search warrants was obtained as a result of an unlawful detention of Mr. Jones and a warrantless entry into his home without consent. Following a hearing, the district court entered an order denying Mr. Jones's motion to suppress.

The district court's order contained a number of points that are relevant for purposes of this appeal. First, the district court held that the Missouri officers'

9

mistaken belief that they were in Missouri, when they were really in Kansas, "does not alter the familiar analysis a federal court must undertake in this situation: whether the actions of the troopers violated Defendant's Fourth Amendment right to be free from unreasonable government searches and seizures." R., Vol. I, at 121–22 (footnote omitted). Second, the district court held that for purposes of the Fourth Amendment, Mr. Jones was not seized at the time of the initial conversation with the officers because "a reasonable person would not have felt that he or she was unable to terminate the encounter." *Id.* at 126. Third, the district court held that, based on the totality of the circumstances, the officers had reasonable suspicion of criminal activity when they received Mr. Jones's identification. Fourth, the district court held that Mr. Jones voluntarily consented to the officers entering his residence. Finally, the district court held that because all of the Missouri officers' actions were lawful under the Fourth Amendment, no viable challenge to the search warrants remained.

Following the denial of his motion to suppress, Mr. Jones entered a conditional guilty plea to the marijuana-manufacturing count (Count I) and the firearm-brandishing count (Count II) of the indictment.[4] Mr. Jones was sentenced to sixty months' imprisonment as to Count I and eighty-four months' imprisonment as to Count II, to be served consecutively, for a total term of 144

---

[4] The felon-in-possession count (Count III) was dismissed on the motion of the government.

months, with four years of supervised release.

This timely appeal followed.

## III

In reviewing a denial of a motion to suppress, "we review the [district] court's factual findings for clear error and view the evidence in the light most favorable to the government." *United States v. Worthon*, 520 F.3d 1173, 1178 (10th Cir. 2008). "The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *Id.* Finally, "[w]e review de novo the reasonableness of a search or seizure under the Fourth Amendment." *Id.*

For several reasons, Mr. Jones contends that the district court erred in denying his motion to suppress. First, he argues that because the Missouri officers were acting outside of their jurisdiction (that is, in Kansas), without more, their seizure of Mr. Jones effected a Fourth Amendment violation. Second, he contends that the Missouri officers' accusatory conversation with him outside of his home was not a consensual citizen-police encounter and amounted to a seizure. Third, he also may contend (albeit inartfully) that there was not reasonable suspicion for the officers to take his driver's license and detain him. Fourth, he maintains that he did not consent to the Missouri officers' entry into his home. Finally, because the Kansas search warrants for his home and car were based upon information improperly unearthed by the Missouri officers in

11

violation of the Fourth Amendment, the evidence secured by authority of the warrants is tainted by this constitutional illegality and is thus inadmissable. We address each of these contentions in turn. We ultimately conclude that Mr. Jones's arguments are without merit and that the district court did not err in denying Mr. Jones's motion to suppress.

A

There appears to be no dispute that, when they interacted with Mr. Jones, the Missouri officers were acting outside of their jurisdiction and were not authorized by Kansas law to perform law-enforcement functions. In particular, by Kansas statute, law enforcement officers from another state retain the power to arrest in Kansas only when in "fresh pursuit" of a person who has committed a crime in the other state. *See* Kan. Stat. Ann. § 22-2404(2) ("Any law enforcement officer of another state who enters this state in fresh pursuit and continues within this state in fresh pursuit of a person in order to arrest him on the ground that he has committed a crime in the other state has the same authority to arrest and hold such person in custody as law enforcement officers of this state . . . ."). Mr. Jones contends that this fresh-pursuit provision did not authorize the Missouri officers' actions in Kansas, and the government does not argue to the contrary.

In its order denying the motion to suppress, the district court stated:

> The parties noted in their written submissions that, because Blunt and his fellow Missouri State Troopers crossed the state line into Kansas and contacted Defendant while mistakenly believing they

12

were still in Missouri, the troopers lacked authority to act as law-enforcement officers under Kansas law. This mistake, however, does not alter the familiar analysis a federal court must undertake in this situation: whether the actions of the troopers violated Defendant's Fourth Amendment right to be free from unreasonable government searches and seizures.

R., Vol. I, at 121–22. To the contrary, Mr. Jones contends: "The federal law is clear that when a police officer effectuates a seizure, or warrantless arrest, upon an individual outside the officer's state jurisdiction, he violates the Fourth Amendment." Aplt. Opening Br. at 18; *see* Aplt. Reply Br. at 3 ("[A] Fourth Amendment violation occurred by virtue of the Missouri Highway Patrol officers seizing Mr. Jones while operating outside their state jurisdiction, *regardless* of how reasonable that seizure might have been." (emphasis added)). Mr. Jones is mistaken.

It is "well established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by *Federal law* even though the police actions are those of state police officers." *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (emphasis added) (quoting *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999)) (internal quotation marks omitted); *see Bowling v. Rector*, 584 F.3d 956, 968 (10th Cir. 2009) ("[F]or Fourth Amendment purposes, the conduct of officers acting in excess of their statutory authority must be tested by traditional Fourth Amendment standards . . . ."); *see also Virginia v. Moore*, 553 U.S. 164, 176

13

(2008) (holding that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections"); *California v. Greenwood*, 486 U.S. 35, 43 (1988) ("We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs."); *cf. United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) ("The federal test for determining the validity of consent to search does not require a district court to consider whether a law enforcement officer has authority under state law to request consent."). More specifically, "officers' violation of state law is not, without more, necessarily a federal constitutional violation." *United States v. Mikulski*, 317 F.3d 1228, 1232 (10th Cir. 2003); *accord Pasiewicz v. Lake Cnty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("A violation of a state statute is not a *per se* violation of the federal Constitution. The federal government is not the enforcer of state law."); *see United States v. Gonzales*, 535 F.3d 1174, 1182 (10th Cir. 2008) ("A state-law violation does not, however, necessarily rise to the level of a federal constitutional violation."). Accordingly, Mr. Jones's argument that the Missouri officers' actions effected a Fourth Amendment violation simply because they were acting outside of their jurisdiction and without authority under Kansas law is mistaken.

While "compliance with state law may be relevant to our Fourth Amendment reasonableness analysis" in some circumstances, "we have never held it to be determinative of the constitutionality of police conduct." *Gonzales*, 535 F.3d at 1182; *see Sawyer*, 441 F.3d at 899 ("State law is not determinative of the federal question, but rather may or may not be relevant to the determination of the federal question."). In *Gonzales*, we explained that "compliance with state law is 'highly determinative' only when the constitutional test requires an examination of the relevant state law or interests." 535 F.3d at 1182 (quoting *Sawyer*, 441 F.3d at 896–97). No such examination was required in *Gonzales*:

> [W]e need not examine state law or interests. The federal test for determining the validity of a traffic stop simply requires us to determine whether a traffic violation has occurred . . . . It does not require an examination of a state's law or interests, but focuses instead on whether the stop was reasonable under the circumstances.

*Id.* at 1183 (citation omitted). We do not perceive such an examination of state-law interests to be required here either. The Missouri officers' encounter with Mr. Jones principally implicates federal legal standards related to the reasonableness of a Fourth Amendment seizure and, at least under the circumstances of this case, we see no need to assess state-law interests.[5] Notably,

---

[5] By way of contrast, in *Sawyer*, an officer's failure to comply with state law was critical to a determination of whether exigent circumstances justified a warrantless search because the "federal test for exigent circumstances asks in part whether a state assigns a high level of interest to the evidence the government seeks to admit." 441 F.3d at 896; *see also id.* at 897 (discussing inventory searches and noting they also "involve a

(continued...)

15

Mr. Jones does not directly refute this point; in particular, he does not allege that we are obliged to take into account any particular state-law interests. Thus, on these facts, we conclude that whether the Missouri officers were acting without authority under state law (that is, Kansas law) is essentially irrelevant. *See Green*, 178 F.3d at 1105 ("[T]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." (quoting *Le*, 173 F.3d at 1265) (internal quotation marks omitted)).

In arguing to the contrary, Mr. Jones relies heavily on our decision in *Ross v. Neff*, 905 F.2d 1349 (10th Cir. 1990). He certainly is not the first to do so. *See, e.g.*, *Swanson v. Town of Mountainview*, 577 F.3d 1196, 1201–03 (10th Cir. 2009); *Gonzales*, 535 F.3d at 1182 n.2; *Sawyer*, 441 F.3d at 898; *Mikulski*, 317 F.3d at 1231–32; *Green*, 178 F.3d at 1106. Only a few years ago, in *Swanson*, we described the facts of *Ross*:

> In *Ross*, a visitor on Indian tribal land claimed that an Oklahoma state police officer who had observed him commit a crime unlawfully arrested him on tribal land. The defendant contended the officer could not arrest him because a federal statute limited jurisdiction on tribal lands to federal agents and Indian officials.

---

[5](...continued)
special incorporation of state law into Fourth Amendment jurisprudence"); 1 Wayne R. LaFave, *Search and Seizure* § 1.5(b), at 170 (4th ed. 2004) ("[I]n some circumstances, the controlling Fourth Amendment doctrine has been expressed in such a way that state law is a necessary consideration in determining the reasonableness, in a Fourth Amendment sense, of the police conduct.").

16

> We found the arrest violated the Fourth Amendment, holding that a "warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause" and is "presumptively unreasonable" in the absence of exigent circumstances.

577 F.3d at 1201 (quoting *Ross*, 905 F.2d at 1354).

At first blush, *Ross* would seem to advance Mr. Jones's cause and be apposite on these facts. However, as we carefully explicated in *Swanson*, subsequent decisions of our court have very narrowly circumscribed the precedential reach of *Ross* and "illustrate[d] the limited scope" of its holding. *Id.* at 1202. Contrary to Mr. Jones's suggestion, these subsequent decisions have done a great deal more than subject *Ross*'s holding to "some fine-tuning." Aplt. Opening Br. at 19.

Notably, in *Mikulski*, "we held a Utah detective did not violate the Fourth Amendment when making a warrantless arrest outside his home jurisdiction, but within another political subdivision of the state." *Swanson*, 577 F.3d at 1202. "In reaching this conclusion, we emphasized that state law allowed peace officers (with authorization) to act within neighboring political subdivisions, whereas in *Ross*, under no circumstances would the officer have had authority to act on tribal lands." *Id.*; *see also Pasiewicz*, 270 F.3d at 526 n.3 (distinguishing *Ross* by "pointing out that [it] involved the ability of an Oklahoma state officer to arrest a Native American on tribal trust land" and that "[u]nder federal law, the state

17

could assume criminal jurisdiction over the land only with congressional approval or tribal consent" whereas "[t]he present case concerns the jurisdiction of officers acting between political subdivisions of the same state").

Furthermore, in *Gonzales*, "we held that an extra-jurisdictional traffic stop [by officers in another municipality of the same state] based on an observed traffic violation does not constitute a Fourth Amendment violation, despite the fact that the stop violated state law." *Swanson*, 577 F.3d at 1202. Among other things, we reasoned that "the arrest in *Ross* took place on federal tribal land, and not within a political subdivision, i.e., a municipality, of the same state." *Id.* at 1203 (internal quotation marks omitted).

Finally, we have indicated that even when the police officers' extra-jurisdictional conduct occurs in *another state* (as opposed to another political subdivision of the same state), at least in certain contexts, the officers lack of authority will be of no or little import in the Fourth Amendment analysis. *See Sawyer*, 441 F.3d at 895–98. Specifically, in *Sawyer*, we assessed and ultimately upheld the Fourth Amendment validity of a consent to search that Kansas officers obtained while conducting an investigation in Oklahoma. *See id.* at 895. We stated that "[t]he federal test for determining the validity of consent to search does not require a district court to consider whether a law enforcement officer has authority under state law to request consent." *Id.* More specifically, we observed that "[t]he federal totality of circumstances test does not require an analysis of the

18

legal parameters of the Kansas Officers' jurisdictional authority under state law."

*Id.* Like Mr. Jones, the defendant in *Sawyer* relied on *Ross*. In distinguishing

*Ross*, we concluded: "Although we agree that Oklahoma's interest in monitoring

law enforcement personnel within its boundaries is strong, that interest is not

sufficient to elevate this state law violation to a federal constitutional violation."

*Id.* at 898. At the end, "we decline[d] to extend *Ross* to the facts of th[at] case."

*Id.*

Guided by our post-*Ross* decisions, we conclude that Mr. Jones's reliance

on *Ross* is unavailing. Although we do not dispute Mr. Jones's assertion that

*Ross* "remains good law today," Aplt. Opening Br. at 19, it is only good law

within the scope defined and clarified by our subsequent decisions—*viz.*, as far as

those decisions indicate that *Ross* goes. And those post-*Ross* decisions strongly

suggest that *Ross* travels no further than the unique factual circumstances that

spawned it: that is, a warrantless arrest by state police on federal tribal land.

Whatever the precise contours of *Ross*, under the guidance of our post-*Ross*

decisions, it is beyond peradventure that Mr. Jones's interpretation of *Ross*'s

import is mistaken. In particular, we specifically reject Mr. Jones's assertion that

*Ross* stands for the following broad proposition: "When a person is seized outside

the state jurisdictional limit of a law enforcement officer who is acting without a

warrant, that person's Fourth Amendment constitutional right to be free from

unreasonable seizures has been violated." *Id.* at 19–20. At bottom, we conclude

19

that *Ross* is not controlling under the totality of the circumstances present here—where, *inter alia*, the Missouri officers unknowingly traveled into another state, Kansas; they conducted an unauthorized criminal investigation there (although Kansas does allow, in very limited circumstances, law enforcement officers from another state to operate within its borders); and they ultimately seized Mr. Jones.

In sum, for all of the foregoing reasons, we reject Mr. Jones's argument that the Missouri officers' seizure of him in Kansas effected a Fourth Amendment violation simply because they were acting outside of their jurisdiction and without authority under Kansas law.

**B**

"The Fourth Amendment protects the public from 'unreasonable searches and seizures,' U.S. Const. amend. IV, including unreasonable 'investigatory stop[s]' or detentions." *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012) (alteration in original) (quoting *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)). The Supreme Court has identified three types of police-citizen encounters: consensual encounters, investigative stops, and arrests. *See Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). First, "[c]onsensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." *Id*. Second,

20

"[i]nvestigative *Terry* stops, are, however, 'seizures' within the meaning of the Fourth Amendment; accordingly, a law enforcement officer, based on the totality of the circumstances, 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Villagrana-Flores*, 467 F.3d 1269, 1273 (10th Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see United States v. Guardado*, 699 F.3d 1220, 1222 (10th Cir. 2012) ("In the absence of probable cause, the constitutionality of a search or seizure hinges on the objective reasonableness of an officer's suspicion."). Finally, "actual arrests, which are characterized by a highly intrusive or lengthy search or detention, require that a reasonable officer would have probable cause to believe the arrestee has committed a crime." *Villagana-Flores*, 467 F.3d at 1273 (citations omitted) (internal quotation marks omitted).

It is important to recognize that "[t]hese categories are not static and may escalate from one to another," *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1115 n. 5 (10th Cir. 2007) (en banc)) (internal quotation marks omitted), and "[a] reviewing court must analyze each stage of the [police-citizen] encounter, ensuring that the requisite level of suspicion or cause is present at each stage," *id.* (second alteration in original) (quoting *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)) (internal quotation marks omitted).

**1**

The district court held that Mr. Jones was not seized "at the time of the initial conversation between [Mr. Jones] and [the Missouri officers because] a reasonable person would not have felt that he or she was unable to terminate the encounter." R., Vol. I, at 126. Mr. Jones argues that this was error under the factors we set forth in *United States v. Rogers*, 556 F.3d 1130, 1137–38 (10th Cir. 2009), for assessing whether a citizen has been seized for purposes of the Fourth Amendment.

It is well-established that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)) (internal quotation marks omitted). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that []he was not free to leave." *United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010) (first alteration in original) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)) (internal quotation marks omitted); *see, e.g.*, *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) ("A seizure occurs when 'a reasonable person would not feel free to leave or disregard the contact.'" (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1119 (10th Cir. 2010))). "The critical inquiry is whether the police conduct would have

22

communicated to a reasonable person that []he was not at liberty to ignore the police presence and go about [his] business." *Fox*, 600 F.3d at 1258 (quoting *Bostick*, 501 U.S. at 437) (internal quotation marks omitted).

In *Rogers*, we stated that to determine whether an individual has been seized, we should consider several factors, *including*:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

556 F.3d at 1137–38. We also have considered whether an officer indicated to the person that he is free to leave. *See United States v. Ledesma*, 447 F.3d 1307, 1314–15 (10th Cir. 2006). As we evaluate these factors below, we stress that no single factor is dispositive, and this list is not exhaustive. *Rogers*, 556 F.3d at 1138.

With these principles in mind, we conclude that, under the totality of the circumstances, a reasonable person in Mr. Jones's position would have felt free to terminate his encounter with the Missouri officers outside of his home and go about his business during his initial interaction with them. *See Fox*, 600 F.3d at 1258. In other words, the period of time between when the officers first walked up to Mr. Jones until the time the officers took Mr. Jones's license was a

23

consensual encounter. This conclusion is strongly supported by the specific facts of this case when considered in light of the factors we articulated in *Rogers*: (1) while there were three officers on the scene, the testimony presented by Sergeant Blunt indicated that the officers' presence was non-threatening; (2) no officer "brandished" his weapon;[6] (3) the officers did not physically touch Mr. Jones; (4) Sergeant Blunt's tone during the initial conversation was calm and casual; (5) during the initial conversation the officers did not retain Mr. Jones's personal effects; and (6) the officers did not request Mr. Jones to accompany them to a police station. *See Rogers*, 556 F.3d at 1137–38. These facts militate in favor of a conclusion that the initial encounter between the Missouri officers and Mr. Jones was consensual.

We acknowledge that, at least arguably, certain facts march in a different direction. Most potent among these facts is the accusatory nature of Sergeant Blunt's very first statement to Mr. Jones—*viz.*, that he (Sergeant Blunt) was there "for [Mr. Jones's] marijuana plants." R., Vol. II, at 187. Arguably, the statement would have been somewhat jolting to a reasonable person. We accept the notion that Sergeant Blunt's statement likely would have been appreciably more coercive

---

[6] We know of no definition of "brandishing" that would include a law enforcement officer merely wearing his gun in the normal course of his duties. *See United States v. Bowen*, 527 F.3d 1065, 1072–74 (10th Cir. 2008) (describing the various meanings of the concept of "brandish").

to a citizen than if the same subject matter had been addressed in a question, e.g., "do you have any marijuana plants?" *See Ledesma*, 447 F.3d at 1315 (noting, in assessing whether consent to search was given in connection with a consensual law enforcement-citizen encounter, that "[t]he request was phrased as a question"); *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) ("[W]e did not hold that the manner of asking incriminating questions was irrelevant. Nor would it be proper to do so."); *see also* Aplt. Opening Br. at 26 ("Posing a request for consent to search as a question, by its nature, implies that the person to whom the question is directed is free to answer yes or no.").

It does not follow, however, that a reasonable person would have been so cowed by such an accusatory assertion that he would have believed that he was not free to discontinue the encounter and go about his business. *Cf. Fox*, 600 F.3d at 1258. On these particular facts, we cannot conclude that Sergeant Blunt's comment would have had this cowing effect on a reasonable person. It was a single statement—not part of a series of accusatory remarks. *Cf. Little*, 60 F.3d at 712 ("Accusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." (internal quotation marks omitted)). And the statement was "spoken in an ordinary tone of voice." *Ledesma*, 447 F.3d at 1315. We do not believe that Mr. Jones reasonably could have concluded from this single comment that he was not free to discontinue his encounter with Sergeant Blunt.

25

Furthermore, we acknowledge that Sergeant Blunt and the other Missouri officers never told Mr. Jones that he was free to leave. Although this is a factor to consider, the officers were not required to inform Mr. Jones that he was free to leave. *See id.* at 1314 ("[O]fficers need not expressly inform suspects that they are free to go before requesting permission to conduct a search.").

Finally, we recognize that this encounter took place in an alley behind Mr. Jones's house instead of, for example, on a busy public street. However, the district court expressly found as follows: "The troopers did not encircle Defendant. They parked their cars in the alley behind him but did not block the alley from the other direction . . . . Additionally, the court notes that this exchange took place in a relatively open area that was not out of the public's view." R., Vol. I, 125–26 (footnote omitted) (citation omitted). Mr. Jones has not established that these findings are clearly erroneous. And, based upon them, we cannot conclude that the alley setting of the encounter appreciably advances Mr. Jones's seizure contention. Consequently, even giving full consideration to the *Rogers* factors, we conclude that the totality of the circumstances here indicate that the initial encounter between Mr. Jones and the Missouri officers (before they took Mr. Jones's license) was consensual. Thus, we conclude that Mr. Jones was not seized within the meaning of the Fourth Amendment during his initial encounter with the Missouri officers.

26

**2**

Although we have concluded that Mr. Jones was not seized under the Fourth Amendment during his initial encounter with the Missouri officers, the government acknowledges that Mr. Jones was seized once the officers took Mr. Jones's license and proceeded to conduct a records check based upon it. *See, e.g.*, *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995) ("[W]hat began as a consensual encounter quickly became an investigative detention once the agents received [the defendant's] driver's license and did not return it to him."). Recognizing that a seizure had occurred at that point, the district court concluded that the officers' actions were nevertheless reasonable because, based on the totality of the circumstances, the officers had "reasonable, articulable, individualized grounds for suspecting [Mr. Jones] of criminal activity . . . at the time [they] asked for and retained [Mr. Jones's] identification." R., Vol. I, at 128.

As previously noted, an investigative detention must be justified by reasonable suspicion. Although his briefing on the subject is far from pellucid, Mr. Jones does not appear to directly challenge the propriety of the district court's reasonable-suspicion determination. Rather, resurrecting *Ross*, he contends that the seizure that occurred when the officers took his driver's license was not permissible because the Missouri officers were operating outside of their jurisdiction. *See* Aplt. Opening Br. 21 ("In this case, however, no seizure was

27

permitted [when Mr. Jones's identification was taken], because there was no warrant, and the officers were acting outside their state jurisdiction."). For the reasons noted in Part III.A, *supra*, that argument is misguided; consequently, we reject it.

Even if Mr. Jones's briefing could be read as presenting a challenge to the correctness of the district court's reasonable-suspicion determination,[7] Mr. Jones's position would be untenable. To determine whether reasonable suspicion exists, "we must look to the 'totality of the circumstances,' rather than assessing each factor or piece of evidence in isolation." *McGehee*, 672 F.3d at 867 (quoting *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010)); *see United States v. Conner*, 699 F.3d 1225, 1228 (10th Cir. 2012) ("Investigative detentions are Fourth Amendment seizures of limited scope and duration. In order to effect a lawful stop, police must have an objectively reasonable and articulable suspicion that criminal activity is afoot." (citations omitted)). Under this totality-of-the-circumstances test, "[n]o one factor is determinative." *McGehee*, 672 F.3d at 867 (quoting *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc), *abrogated on other grounds as stated in United States v. Stewart*, 473 F.3d 1265, 1268–69 (10th Cir. 2007)) (internal quotation marks omitted). "When making our assessment, 'deference is to be accorded a law enforcement officer's ability to

[7]      In a short argument, the government defends the district court's reasonable-suspicion determination. *See* Aplee. Br. at 11–12.

28

distinguish between innocent and suspicious actions,'" *id.* (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)), and we "need not rule out the possibility of innocent conduct," *id.* (quoting *United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009)) (internal quotation marks omitted). "[W]e consider the reasonableness of an officer's actions using an 'objective standard.'" *Id.* (alteration in original) (quoting *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009)). "Under this objective standard, we ask 'whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate.'" *Id.* (quoting *Winder*, 557 F.3d at 1134) (internal quotation marks omitted).

To begin, there were a number of facts available to the Missouri officers at the time they took Mr. Jones's license that would have justified their objectively reasonable suspicion that Mr. Jones was engaged in criminal activity, warranting his detention for further investigation. *See McGehee*, 672 F.3d at 867; *United States v. Occhipinti*, 998 F.2d 791, 800 (10th Cir. 1993). Among these suspicious facts is Sergeant Blunt's personal observation of Mr. Jones's visit to the Grow Your Own hydroponics store, an establishment that—although legal—was, in Sergeant Blunt's extensive experience, a store that sold all the necessary components to grow marijuana. And it was the type of store that had in the past been frequented by persons that grew marijuana indoors. In addition, at the time the Missouri officers took Mr. Jones's license, they knew that Mr. Jones had been

29

on parole in Missouri for a prior drug offense.

Finally, another significant signal of possible criminal activity came from Mr. Jones himself—specifically, his reaction upon encountering the Missouri officers. Upon walking up to Mr. Jones, Sergeant Blunt said, "I'm Sergeant Troy Blunt with the Missouri State Highway Patrol conducting a drug investigation, and I'm here for your marijuana plants." R., Vol. II, at 187. Mr. Jones responded by saying, "Oh shit." *Id.* at 189. Sergeant Blunt reasonably could have interpreted this response as suggestive of Mr. Jones's involvement in criminal activity. In particular, Sergeant Blunt could have reasonably inferred that Mr. Jones was concerned about his investigation of marijuana plants because Mr. Jones was in possession of such plants.[8] *Cf. United States v. Lopez-Gutierrez*, 334 F. App'x 880, 883–84 (10th Cir. 2009) (observing that a defendant's spontaneous statement to an officer that the vehicle had been in his friend's possession overnight served to reasonably "heighten" the officer's suspicion); *United States v. Karam*, 496 F.3d 1157, 1164 (10th Cir. 2007) (holding that a

---

[8]     At oral argument, Mr. Jones's counsel argued that, although "perhaps" Mr. Jones's statement, "Oh shit," could be interpreted as an indication that he actually had marijuana, it could also mean "that he's got to go through something that he has gone through before and that's a police intrusion into his life." Oral Arg. at 05:10–05:17. As we understand this argument, Mr. Jones's reaction to Sergeant Blunt could have been an innocent reaction. However, in examining the facts available, we "need not rule out the possibility of innocent conduct." *McGehee*, 672 F.3d at 867 (quoting *Albert*, 579 F.3d at 1197). It is enough that Mr. Jones's reaction to Sergeant Blunt could reasonably have been interpreted as indicative of his involvement in criminal activity.

suspicious statement by defendant supported reasonable suspicion even if the officer made an objectively reasonable mistake of fact as to the truth of the statement). Giving deference to the judgment of the Missouri officers in distinguishing between innocent and suspicious actions, as we must, *see McGehee*, 672 F.3d at 867; *Wood*, 106 F.3d at 946; *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994), under the totality of the circumstances, it is patent that, when the Missouri officers took Mr. Jones's license to further conduct their investigation—thereby effecting a seizure of Mr. Jones—their action was supported by reasonable suspicion of criminal activity.

## C

We must next determine whether the officers' subsequent entry into Mr. Jones's residence was lawful under the Fourth Amendment. The district court held that the government met its burden of showing that Mr. Jones voluntarily gave consent to the Missouri officers to enter his residence. On appeal, Mr. Jones disagrees, stating that the government's "burden cannot be met by showing a mere submission to a claim of lawful authority." Aplt. Opening Br. at 25. Under the circumstances present here, we conclude that Mr. Jones's argument is unavailing.

It is beyond question that the Missouri officers' entry into the home constituted a search for purposes of the Fourth Amendment—no matter how limited it was in scope. *See Payton v. New York*, 445 U.S. 573, 582 n.17 (1980)

31

("Inasmuch as the purpose of the Fourth Amendment is to guard against arbitrary governmental invasions of the home, the necessity of prior judicial approval should control *any contemplated entry*, regardless of the purpose for which that entry is sought." (emphasis added)); *id.* at 585–86 ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)); *accord United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006); *United States v. Davis*, 290 F.3d 1239, 1241–42 (10th Cir. 2002). "A warrantless search of a home is presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011).

"Voluntary consent to search is one such exception." *Id.*; *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "Voluntary consent" consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."); *Cruz-Mendez*, 467 F.3d at 1265 ("[C]onsent is valid only if it is freely and voluntarily given."

32

(citation omitted) (internal quotation marks omitted)); *see also United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) ("In whatever form, consent has effect only if it is given freely and voluntarily.").

In determining the voluntariness of consent, the Fourth Amendment requires that "a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion [i]s applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth*, 412 U.S. at 228. It is the government's "burden of proving that consent is given freely and voluntarily." *Harrison*, 639 F.3d at 1278. Further, "[t]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* (quoting *Schneckloth*, 412 U.S. at 227) (internal quotation marks omitted).

When considering the totality of the circumstances, some of the relevant considerations include:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are

> factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id.* (quoting *Sawyer*, 441 F.3d at 895) (internal quotation marks omitted).

As previously noted, Mr. Jones's license was in the possession of the Missouri officers when they entered his residence. Therefore, he was clearly seized under the Fourth Amendment. However, "[a] person may voluntarily consent to a search even while being legally detained." *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007); *see United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997) ("A person who is being detained may give a voluntary consent to search."); *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) ("A person who is being detained may still give a voluntary consent."); *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993) ("Valid consent may be given by a person being detained."); *see also United States v. Olivares-Campos*, 276 F. App'x 816, 824 (10th Cir. 2008) ("[Although being] detained during an investigation no doubt implies an atmosphere not altogether consensual, our precedent firmly instructs us that the fact of an investigative detention, standing alone, is not so coercive as to render the consent of all detained persons involuntary."). "[D]etention is only one factor to be considered in determining whether consent was voluntarily and freely given based on the totality of the circumstances." *Contreras*, 506 F.3d at 1037.

34

Mr. Jones argues that the Missouri officers never obtained valid consent to enter his home for two reasons. First, he argues that the Missouri officers' interaction with him—including Sergeant Blunt's statements that "I'm here for your marijuana plants," and "let's clear up what we have here today . . . [and] make sure that there [are no marijuana plants] here at your house," R., Vol. II, at 187, 193—resulted in an atmosphere in which he reasonably believed that he was *not free* to disregard or ignore the officers' request to search his residence. *See* Aplt. Opening Br. at 25–26. Even if he had given consent to enter his residence, Mr. Jones reasons, the Missouri officers' actions rendered the consent involuntary. Second, Mr. Jones argues that, before the officers entered his house, they never actually received his oral or written consent, despite the fact that "troopers routinely carry written consent forms." *Id.* at 22. We address these arguments in turn.

Mr. Jones argues that Sergeant Blunt's statements rendered involuntary any consent that Mr. Jones may have given. Two of his statements are of primary importance for our analysis: Sergeant Blunt's statement that "I'm here for your marijuana plants"; and his statement, "let's clear up what we have here today . . . [and] make sure that there [are no marijuana plants] here at your house," R., Vol. II, at 187, 193.

The first statement was accusatory and may well have been jolting to a

35

reasonable person.[9] However, as suggested by our earlier examination of this

statement (*see* Part III.B.1), we cannot conclude that a reasonable person would

---

[9] At least arguably, Sergeant Blunt used this accusatory approach to trick Mr. Jones into dropping his guard and making incriminating statements that he might not have otherwise made in responding to less-aggressive language that merely asked about his possible criminal activity. At the time that he made the statement, Sergeant Blunt did not know whether Mr. Jones actually had any marijuana plants. Yet, instead of inquiring about Mr. Jones's possible possession of marijuana plants, Sergeant Blunt sought to convey the impression to Mr. Jones (albeit falsely) through his accusatory assertion that Mr. Jones's criminal possession was a known fact. Indeed, Sergeant Blunt's testimony leaves little doubt that he hoped that his accusatory statement would have a jolting effect on Mr. Jones—specifically, that the statement would prompt Mr. Jones to make a response without carefully considering the possibly incriminating nature of his words or actions. *See, e.g.*, R., Vol. II, at 189–90 ("[T]hat's why I used that approach like that, is to see what his visual reaction is to it, to continue the investigation.").

However, although it is a relevant consideration in the consent calculus, the use of deception is not categorically unlawful. *See, e.g.*, *Sawyer*, 441 F.3d at 895 (listing "deception" and "trickery" as factors in the totality-of-the-circumstances analysis used in assessing the validity of consent); 4 Wayne R. LaFave, *Search and Seizure* § 8.2(n), at 136–37 (4th ed. 2004) (collecting cases and noting that certain kinds of deception are not "inherently incompatible with consent"); *see also Harrison*, 639 F.3d at 1278 ("We have repeatedly held that deception and trickery are *among the factors* that can render consent involuntary." (emphasis added)). Viewed in the context of all the circumstances present here, we cannot conclude that Sergeant Blunt's arguable use of deceit or trickery had a significant impact on the nature of Mr. Jones's consent—that is, on whether his consent was voluntary. It is not the kind of deceit or trickery that ordinarily has been employed to secure consent to search, as opposed to unguarded incriminatory reactions or admissions. For example, this is not a case where Sergeant Blunt lied about the purpose of the investigation or "create[d] the impression that the defendant will be in physical danger if he or she refuses to consent to the search." *Harrison*, 639 F.3d at 1279; *see* 4 LaFave, *supra*, § 8.2(n), at 133 (discussing circumstances where "[t]he known official may engage in deception which leads the consenting party to conclude that the official's objective is other than criminal prosecution or that the official's objective relates to a form of criminal activity different from that which actually prompted the official to seek consent"). And Mr. Jones has not suggested that any such deceit or trickery played a role in his subsequent grant of consent to search.

36

have felt so threatened or cowed by the statement that he or she would have involuntarily complied with an officer's requests or directions—*viz.*, that a reasonable person would have been so adversely impacted by the statement that he or she would have involuntarily consented to a search. In other words, assessed in light of these particular facts, we cannot conclude that this statement would have been sufficiently potent—viewed objectively—to override Mr. Jones's free will.

Nor do we believe that the second statement moves Mr. Jones significantly closer to the goalpost. To be sure, that statement expressed Sergeant Blunt's desire to keep his investigative focus on Mr. Jones's residence. However, nothing in this record leads us to believe that a reasonable person would have been so enervated by the surrounding circumstances that he would not have felt capable of rebuffing Sergeant Blunt's desired investigative plan. In other words, we cannot conclude from this record that Sergeant Blunt's statement of investigative intent—viewed alone, or coupled with his first statement about the marijuana plants—was objectively sufficient to overpower Mr. Jones's free will and render him incapable of denying consent to enter his residence.

Indeed, the record belies the contention that Mr. Jones did not voluntarily consent to the officers' entry into his residence. After Mr. Jones's license was seized, Sergeant Blunt indicated to Mr. Jones that they would like to search his

37

residence. Subsequently, Mr. Jones turned and began walking toward his house. The officers followed Mr. Jones through a porch area to the back door, where Mr. Jones (without being physically forced to do so) produced a set of keys to unlock the storm door. After entering the residence, Mr. Jones walked through the kitchen and into a living room area, at which time he turned and faced the troopers to make a gesture with his hands as if to indicate, "see, I got no plants. I got nothing." R., Vol. II, at 199. Sergeant Blunt then gave Mr. Jones a look indicating "I can smell [the marijuana]" and "let's just get this over with." *Id.*

The record indicates that Mr. Jones was "free to move about [his] home and . . . determine where he wanted to lead the officers," *id.*, Vol. I, at 131—a fact that greatly undercuts Mr. Jones's protestation that he was merely submitting to "a claim of lawful authority." Aplt Opening Br. at 25. Furthermore, we note the absence of any physical mistreatment of Mr. Jones, and the absence of any threats or promises made by the officers. *See Harrison*, 639 F.3d at 1278. Nor is there anything in the record to suggest that Mr. Jones's physical or mental condition (or capacity) was diminished. *See id.*; *Sawyer*, 441 F.3d at 895.

In sum, on these facts, the only objectively reasonable conclusion we can draw is that Mr. Jones's consent was freely and voluntarily given. And there is no factual support for the view that his consent was borne out of duress or coercion. *See United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993);

38

*United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993) (holding that the presence of five officers did not outweigh the numerous factors indicating that the resident voluntarily consented, including that the defendant voluntarily allowed the officers to enter the house, that she was not coerced, frightened or otherwise threatened, that she had a cordial conversation with officers spoken in low volume, and that the officers made no promises or threats in an attempt to extract her consent).[10]

Voluntariness aside, in his second argument, Mr. Jones contends that he never actually consented to the officers' entrance into his residence when he turned and walked away from them. We note at the outset that the fact that Mr. Jones did not give explicit consent—oral or written—to the Missouri officers to enter his residence is not determinative. An implied consent to search would be no less valid. *See United States v. Patten*, 183 F.3d 1190, 1192–95 (10th Cir. 1999) (holding that consent to search was valid where the officer repeatedly asked the defendant to open his suitcase and in response the defendant did so gradually);

---

[10]   For the first time in his reply brief, Mr. Jones contends that any consent that he gave was legally infirm because he did not know that the Missouri officers were operating outside of their jurisdiction; he deems this to be an issue of informed consent (or, more precisely, the lack thereof). *See* Aplt. Reply Br. at 5 ("Mr. Jones, however, would have *never* given consent to the Missouri Highway Patrol to search his residence had he *known* that they were acting beyond their authority, and he was under no obligation to do so."). We decline to consider this late-blooming contention. *See, e.g.*, *United States v. Bader*, 678 F.3d 858, 876 n.11 (10th Cir. 2012).

*United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) ("When [the officer] encountered the locked bag, she asked [the defendant], 'Can you open that?' [The defendant] apparently did not respond verbally but removed the key from his pocket and handed it to [the officer]." (citation omitted)); *see also Carter*, 378 F.3d at 587 ("Consent to a search may be in the form of words, gesture, or conduct." (citation omitted) (internal quotation marks omitted)).  In other words, if Mr. Jones said or did something that permitted the Missouri officers to form a reasonable belief that Mr. Jones was authorizing them to follow him into his residence, then Mr. Jones may be deemed to have impliedly consented to their entry of his home.  *See United States v. Guerrero*, 472 F.3d 784, 789–90 (10th Cir. 2007) ("Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."); *accord United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998) ("[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual."); *see also United States v. Coulter*, 461 F. App'x 763, 766–67 (10th Cir. 2012) (holding that implied consent was valid where an officer explained that he did not want an occupant to go inside her house alone for officer-safety reasons, and the occupant simply looked at the officer and entered the house with the officer following); *United States v. Malady*, 209 F. App'x 848, 851–52 (10th

40

Cir. 2006) (holding that the consent was valid where the "Appellant told the officer that the vehicle ownership papers the officer had requested were upstairs, then Appellant walked up the stairs without further conversation" and "[a]t no point did Appellant tell the officer to stay downstairs or otherwise indicate that the officer was not welcome to follow him").

There can be no doubt that Mr. Jones's actions here—though non-verbal—could have been reasonably interpreted by the Missouri officers as communicating Mr. Jones's consent to their accompanying him into his home. Briefly revisiting the factual landscape, sometime after Sergeant Blunt took Mr. Jones's license, he indicated to Mr. Jones that the officers would like to search his residence. Sergeant Blunt testified that Mr. Jones responded by turning and beginning to walk toward the back door of his residence. Upon walking up to his backdoor, Mr. Jones made no attempt to stop the officers—through words or otherwise—from following him into his residence. Nor did Mr. Jones inquire why the officers were following him. These and other affirmative acts—such as unlocking his backdoor and, once inside, turning toward the officers to make a gesture with his hands as if to state, "see, I got no plants. I got nothing"—are not actions that a reasonable officer would have interpreted as signaling Mr. Jones's refusal of the officers' entry into his residence. Thus, for purposes of the Fourth Amendment, it is clear that Mr. Jones's conduct constituted legally sufficient

41

consent for the officers to enter his residence.

## D

Finally, Mr. Jones argues that the district court improperly refused to suppress the evidence that was obtained from the Kansas search warrants for his home and vehicle because Kansas law enforcement principally relied upon information that was illegally unearthed by the Missouri officers. Specifically, Mr. Jones argues that the Missouri officers came across the evidence while operating outside their jurisdiction and as a result of illegally seizing him and entering his home without consent. *See* Aplt. Opening Br. at 30 ("[T]he facts critical to a probable cause determination, submitted to the magistrate in the warrant application, were the product of the illegal seizure of Jones, and the warrantless, nonconsensual entry into his home."). However, we have concluded that the Missouri officers' lack of authority under Kansas law is of no import to the Fourth Amendment seizure analysis on these facts; that Mr. Jones was not otherwise improperly seized, as the seizure was supported by reasonable suspicion; and that Mr. Jones provided legally sufficient consent to authorize the Missouri officers' entry into his home. Therefore, the evidence that the Missouri officers obtained during their investigation could properly form the basis for the two warrants secured by the Kansas officers. The district court did not err in declining to suppress evidence discovered in the searches authorized by these

42

warrants.

## IV

For the foregoing reasons, we **AFFIRM** the district court's order denying Mr. Jones's motion to suppress and the court's resulting judgment.