FILED
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

FRANCIS WOODY,

     Defendant - Appellant.

No. 21-2007

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:18-CR-03902-JB-1)**

_____

Todd B. Hotchkiss, Albuquerque, New Mexico, for Defendant-Appellant.

Raquel Ruiz-Velez, Assistant United States Attorney (Fred J. Federici, Acting United States Attorney, with her on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee.

_____

Before **MORITZ**, **EBEL**, and **KELLY**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

In August 2019, Defendant-Appellant Francis Woody was tried and convicted

of one count of aggravated sexual abuse in violation of 18 U.S.C. §§ 1153, 2241(c)

and 2246(2)(C), and two counts of abusive sexual contact in violation of 18 U.S.C.

§§ 1153, 2244(a)(5) and 2246(3). The district court sentenced him to life imprisonment on each count, to run concurrently.

Evidence presented against Mr. Woody at trial included incriminating statements he made during two separate encounters with federal agents, as well as a doctor's testimony that one of Mr. Woody's victims identified Mr. Woody as her abuser during a medical examination. Mr. Woody appeals his convictions, asserting that the district court should have suppressed his statements to the federal agents because the agents violated his constitutional rights and, separately, should have excluded the doctor's testimony as inadmissible hearsay. Mr. Woody also challenges his life sentence as substantively unreasonable. Exercising our jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we find no merit in these arguments and thus AFFIRM Mr. Woody's convictions and sentence.

## I.    BACKGROUND

### A. Factual Background

In October 2016, Jane Doe 1 was an eight-year-old member of the Navajo Nation who lived with her mother and stepfather Mr. Woody in Ojo Encino, New Mexico, most of the time. While temporarily staying with her father in Torreon, New Mexico, Jane Doe 1 told her father that Mr. Woody had been sexually abusing her. Her father brought her to a hospital, where she was examined in the emergency room by Dr. Stephen Pilon. Dr. Pilon took Jane Doe 1's medical history, at which point Jane Doe 1 told Dr. Pilon that Mr. Woody had been molesting her by kissing her and touching her genitals, with the last incident of abuse occurring about 30 days prior to

2

the hospital visit.  Dr. Pilon examined Jane Doe 1 and found no signs of physical injury.  He then reported the sexual abuse to Navajo Nation Social Services, which referred the case to the Federal Bureau of Investigation (FBI).

On April 25, 2018, FBI Special Agents Ross Zuercher and Thaddeus Clancy sought out Mr. Woody to follow up on the report and located him at his niece's house in New Mexico.  The agents drove an unmarked car and were dressed in plain clothes, with their firearms concealed.  Upon arriving at the house, they saw a man lying under a car in the front yard, performing repairs.  They approached the man and identified themselves as FBI agents looking for Mr. Woody.  The man identified himself as Mr. Woody.  Agent Zuercher asked Mr. Woody if he would speak to them and suggested going somewhere with more privacy than the front yard, where Mr. Woody's girlfriend was also present.  Mr. Woody agreed and led the agents inside his niece's mobile home.  The agents sat on one couch in the living room while Mr. Woody sat on the couch closer to the door, three or four feet away from the agents. The ensuing conversation was recorded by Agent Zuercher.

After preliminary questioning and general discussions about Mr. Woody and his family, Agent Zuercher asked Mr. Woody about the specific claims of abuse made by Jane Doe 1.  Mr. Woody denied the allegations at first.  Agent Zuercher told Mr. Woody that if the abuse was "a one-time thing," it could be "explained away" and would be "no big deal."  Supp. R. Vol. II, Exh. 3A at 30:35-31:20, 31:36-31:41. Mr. Woody said that he might have done it when he was drunk because he could not remember any of the alleged abuse.  Agent Zuercher then assured Mr. Woody that he

3

would not be arrested that day, but emphasized that the agents needed "to know what happened that night just so we can make sure that we've covered everything that we needed to cover." Id. at 37:23-37:38. Mr. Woody eventually admitted that he once touched and partially penetrated Jane Doe 1's vagina with his finger. At Agent Zuercher's request, Mr. Woody drew a diagram of the penetration and wrote an apology letter to Jane Doe 1. Mr. Woody denied any other instances of abuse against Jane Doe 1 or another alleged victim, however. The agents told Mr. Woody they might call him in later for further questioning or a polygraph test. Shortly thereafter, they shook his hand and left the residence.

After this April 25 interview, Agent Zuercher spoke with Jane Doe 2, whose mother had been married to Mr. Woody for about ten years until their separation in May 2006, when Jane Doe 2 was approximately thirteen years old. The three lived on the Navajo Nation in New Mexico during the marriage. Jane Doe 2 recalled multiple instances where she was sexually abused as a child by Mr. Woody, the earliest being a time when he touched her vagina over her clothes when she was about six years old. The abuse continued until Jane Doe 2 and her mother left Mr. Woody's house in 2006.

After interviewing Jane Doe 2, Agent Zuercher contacted Mr. Woody and asked him to meet again for more questioning. Mr. Woody agreed and they scheduled an October 23, 2018, meeting at a state police station in Cuba, New Mexico, approximately thirty miles from Mr. Woody's town. When Mr. Woody arrived at the station at 9:00 AM on October 23, Agent Zuercher let him in and shook

his hand.  He also introduced Mr. Woody to Agent Marcus McCaskill, an FBI polygraph examiner.  Both agents were in plain clothes, and Agent Zuercher's weapon was concealed while Agent McCaskill was unarmed.  Their badges were likewise not visible.  Mr. Woody was not patted down, searched, handcuffed, or otherwise restrained.

Agent McCaskill led Mr. Woody to an interview room where the polygraph equipment had been set up.  Agent McCaskill closed the door to the room behind them but did not lock it; Agent Zuercher waited outside the room.  Agent McCaskill and Mr. Woody sat down facing each other at the table with the equipment.  Agent McCaskill explained to Mr. Woody that he would make sure Mr. Woody understood his rights and confirmed that Mr. Woody was still willing to take the polygraph test.  Agent McCaskill also told Mr. Woody that he was free to leave at any time if he did not wish to waive his rights or take the polygraph examination.  Agent McCaskill then showed Mr. Woody a standard advice-of-rights form that explained the rights set forth in Miranda v. Arizona, 384 U.S. 436 (1966).  Agent McCaskill read portions of the form aloud and explained it to Mr. Woody.  After going through the form, Agent McCaskill asked Mr. Woody if he understood his rights, and Mr. Woody said that he did.

Next, Agent McCaskill asked Mr. Woody if he wanted to answer questions without an attorney present.  Mr. Woody twice responded, "I guess," and both times Agent McCaskill told him that he needed a clearer answer than that, stating, "If you want an attorney, if you don't want to answer questions today, then that's your right."

R. Vol. III at 101.  In response to Agent McCaskill's request for a yes or no answer to whether Mr. Woody would answer questions without counsel, Mr. Woody said, "I will." Id. at 102.  Mr. Woody also signed the advice-of-rights form, which included a waiver of his Miranda rights, on Agent McCaskill's computer screen.

Agent McCaskill then pulled up the FBI's separate consent form for polygraph interviews and went over it with Mr. Woody.  He reiterated that Mr. Woody did not have to take the polygraph and could leave at any time.  Mr. Woody signed the form and agreed to continue with the polygraph examination.

With the forms sorted out, Agent McCaskill began asking questions, but did not yet begin the polygraph test.  He first asked Mr. Woody about his background, criminal history, alcohol use, health, and employment before asking about the specific sexual abuse allegations made by Jane Doe 2.  Agent McCaskill expected Woody to deny the allegations, but instead Mr. Woody admitted to using Jane Doe 2's hand to touch his penis.  Because of this admission, Agent McCaskill decided not to continue with the polygraph and stepped out of the room to inform Agent Zuercher.  The two agents came back in together and restarted the questioning of Mr. Woody without the polygraph, recording the conversation.  Mr. Woody repeated his admission of an incident where he sexually abused Jane Doe 2 when she was about ten years old, and further admitted to a similar act on a second occasion during that same time period.  Mr. Woody also admitted to digitally penetrating Jane Doe 1's vagina on one occasion when she was very young.

6

After the questioning and at the agents' request, Mr. Woody wrote an apology letter to Jane Doe 2.  The agents shook his hand and thanked him for talking to them.  Mr. Woody then left the station.

### B. Procedural Background

A grand jury charged Mr. Woody with aggravated sexual abuse of Jane Doe 1, in violation of 18 U.S.C. §§ 1153, 2241(c) and 2246(2)(C), and two counts of abusive sexual contact with Jane Doe 2, in violation of 18 U.S.C. §§ 1153, 2244(a)(5) and 2246(3).

Prior to his jury trial, Mr. Woody filed motions to suppress the statements he made during both the April 25 encounter with agents and the October 23 encounter with agents, asserting that the agents violated his constitutional rights in obtaining the statements.  The government opposed the motions, and the district court denied them.

Separately, the government sought to introduce testimony from Dr. Pilon regarding Jane Doe 1's statements identifying Mr. Woody as her abuser.  The government asserted that this testimony was admissible under the hearsay exception for statements made for the purpose of medical diagnosis.  See Fed. R. Evid. 803(4).  Mr. Woody opposed the motion to admit, but the district court determined that the testimony was indeed admissible under Rule 803(4).

As a result, during Mr. Woody's two-day trial in August 2019, the jury heard evidence of Mr. Woody's admissions to the agents and Jane Doe 1's identification of

him as her abuser to Dr. Pilon. The jury convicted Mr. Woody of all three charged counts.

After the trial, a Presentence Investigation Report (PSR) was prepared for Mr. Woody's sentencing. It calculated a total offense level of 43 and a criminal history category of I, resulting in a recommended sentence of life imprisonment under the federal sentencing guidelines. Mr. Woody asked the district court to vary downward to a sentence of 30 years based on sentencing factors such as his age, good relationship with his family, and work ethic. The government sought a life sentence based on the PSR recommendation and the 18 U.S.C. § 3553(a) factors. The district court ultimately sentenced Mr. Woody to life imprisonment on each count, to be run concurrently.

On February 5, 2021, Mr. Woody filed a timely appeal of his convictions and his sentence, which we now review.

## II.    DISCUSSION

Mr. Woody raises four distinct issues to this court. He appeals the denial of his motion to suppress the statements he made during the April 25 FBI interview, the denial of his motion to suppress his October 23 statements to the FBI agents, the admission of Dr. Pilon's testimony as to Jane Doe 1's identification of Mr. Woody, and the substantive reasonableness of his life sentence. We address and reject each argument in turn.

8

**A. Motion to Suppress April 25 Statements**

Mr. Woody first argues that the district court erred in denying his motion to suppress the statements he made when the FBI agents interviewed him at his niece's home on April 25, 2018, because his Fourth Amendment rights were violated when the agents seized him without his consent.[1]  In reviewing the denial of a motion to suppress, we examine the district court's legal determinations de novo and its factual findings for clear error, United States v. Cook, 599 F.3d 1208, 1213 (10th Cir. 2010), though the facts here are largely undisputed.  We also "view[] the evidence in the light most favorable to the district court's [factual] finding."  Id.

The Fourth Amendment protects citizens against "unreasonable searches and seizures."  U.S. Const. Amend. IV.  In applying the Fourth Amendment to alleged seizures by law enforcement, this court has distinguished between "consensual encounters which do not implicate the Fourth Amendment"; "investigative detentions which are Fourth Amendment seizures of limited scope and duration"; and "arrests, the most intrusive of Fourth Amendment seizures." United States v. Torres-Guevara, 147 F.3d 1261, 1264 (10th Cir. 1998) (quoting United States v. Shareef, 100 F.3d

---

[1] Though Mr. Woody's arguments related to the April 25 encounter focus primarily on the Fourth Amendment, he occasionally cites case law discussing the meaning of "custody" under the Fifth Amendment and cursorily mentions the Fifth Amendment as a basis for his claim.  Aplt. Br. at 43 (citing United States v. Griffin, 7 F.3d 1512, 1517 (10th Cir. 1993); Aplt. Br. at 49 ("The seizure of Mr. Woody was unreasonable in violation of his Fourth and Fifth Amendment rights." (emphasis added)).  But Mr. Woody never makes a substantive Fifth Amendment argument as to the April 25 encounter, so to the extent that he tried to raise one, we find it inadequately briefed and thus waived. See Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 841 (10th Cir. 2005).

1491, 1500 (10th Cir. 1996)). Mr. Woody asserts that his encounter with FBI agents on April 25 was an investigative detention—which required at least reasonable suspicion to be constitutional, see id.—while the government argues that the encounter was consensual and thus did not implicate the Fourth Amendment. Because the government has not asserted the existence of reasonable suspicion either on appeal or to the district court below, the only question before us is whether the encounter was consensual. If not, the encounter was an investigative detention by the agents without reasonable suspicion, thereby violating Mr. Woody's Fourth Amendment rights.[2] See Florida v. Royer, 460 U.S. 491, 500 (1983) (holding that the government bears the burden of demonstrating reasonable suspicion).

In order to determine whether this encounter was consensual, we must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida. v. Bostick, 501 U.S. 429, 439 (1991). This court has developed a non-exhaustive list of factors to consider in determining whether a suspect would feel free to terminate the encounter:

> [(1)] the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers;

---

[2] Mr. Woody then asserts that his incriminating statements were "fruit of the poisonous tree" and thus inadmissible. Aplt. Br. at 50. But because we ultimately find the encounter consensual and constitutional, we do not address whether the statements were fruit of any Fourth Amendment violation.

10

[(2)] whether the officers touch or physically restrain the defendant;

[(3)] whether the officers are uniformed or in plain clothes;

[(4)] whether their weapons are displayed;

[(5)] the number, demeanor and tone of voice of the officers;

[(6)] whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and

[(7)] whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

United States v. Lopez, 443 F.3d 1280, 1284 (10th Cir. 2006) (quoting United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005)). No single factor is dispositive, but the "strong presence of two or three factors" may be sufficient to support the conclusion a seizure occurred. Id. at 1284–85 (quoting Fuerschbach v. Southwest Airlines Co., 439 F.3d 1197, 1203 (10th Cir. 2006)). We thus examine the presence of each factor in this case, as well as other facts that Mr. Woody highlights to argue that the encounter was a seizure.

### i. Location of the encounter

As Mr. Woody notes, his conversation with the FBI agents on April 25 took place inside his niece's home, out of public view. This factor thus weighs in Mr. Woody's favor to show that the encounter was not consensual. Id. That said, we think the weight of this factor is minimal given that Mr. Woody specifically agreed to speak with the agents inside. See United States v. Spence, 397 F.3d 1280, 1284 (10th Cir. 2005) (finding that the defendant's "agreement to allow the agents inside his home weighs toward the conclusion that the encounter was voluntary").

11

Mr. Woody also complains that the location of the agents' initial approach, in the home's front yard where Mr. Woody was lying under a car, weighs against a finding of consent because "the FBI agents showed their authority by going onto private property without any permission" and "Mr. Woody could not just walk away as he was at someone else's private residence in the midst of repairing a vehicle." Aplt. Br. at 47, 48–49. We do not find these facts relevant to the analysis. We have already accounted for the fact that Mr. Woody was interviewed at a private residence, and the fact that he could not "walk away" since he was in the middle of car repairs does not mean a reasonable person would have felt unable to "decline the officers' request or otherwise terminate the encounter" there. Bostick, 501 U.S. at 429.

### ii.    Touching and physical restraints

The only touching between the officers and Mr. Woody were their handshakes at the beginning and end of the interaction, which were certainly not gestures that would indicate a person was not free to terminate the encounter. Though the conversation—to which Mr. Woody agreed—took place inside the niece's house with the door closed, the record does not indicate that the door was locked, and indeed Mr. Woody was sitting closer to the door than the officers on the opposite couch. Thus, there were no physical restraints, and this factor does not weigh in favor of finding the encounter a seizure.

### iii.    Uniforms and weapons

The officers were in plain clothes and never showed their weapons. This factor, too, favors finding that the encounter was consensual.

12

### iv.     Number and demeanor of officers

Mr. Woody does not contend that two officers were so many as to give a reasonable person the impression that he would be unable to decline their request to speak with them.  Nor could he make such a contention, without more.  See United States v. Jones, 525 F.3d at 1242 (stating that an encounter with four agents did not weigh in favor of concluding that the suspect was seized in light of officers' appearance and demeanor).  Furthermore, the district court found that Agents Zuercher and Clancy "spoke to Woody throughout the interview in conversational and respectful tones."  R. Vol. I at 414.  This factor thus does not favor seizure.

### v.     Retention of defendants' personal effects

The agents here did not take any personal effects from Mr. Woody at any time, and so this factor is not relevant to our analysis.

### vi.     Advising of right to refuse

Mr. Woody emphasizes that the agents did not specifically inform Mr. Woody that he had the right to refuse to speak to them.  This factor thus favors a finding of seizure, but it is by no means dispositive.  To the contrary, "[t]here is no per se rule requiring such an advisement." United States v. Little, 18 F.3d 1499, 1505 (10th Cir. 1994) (en banc) (citations omitted).

### vii.     Totality of the circumstances

Viewed collectively, the above factors are not sufficient to establish that a reasonable person in Mr. Woody's position would have felt that he "was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501

13

U.S. at 439. The fact that the conversation took place inside a private residence and the fact that the agents did not specifically tell Mr. Woody he was free to leave are simply not enough to turn the encounter into an investigative detention, when accounting for other factors such as Mr. Woody's agreement to speak to the agents inside, the agents' friendly demeanor and plain-clothes appearance, and the lack of any physical restraint on Mr. Woody.

That said, the above list of factors is non-exhaustive. Lopez, 443 F.3d at 1284. Mr. Woody argues that certain statements made by the agents during the encounter rendered it nonconsensual because they were deceptive.[3] Specifically, he complains that Agent Zuercher lied to him by stating that it would be "no big deal" if Mr. Woody had abused Jane Doe 1 just one time. Aplt. Br. at 44–45. Agent Zuercher was indeed lying to Mr. Woody with this statement. Even one instance of child sexual abuse is a major crime, and Agent Zuercher said he was aware of that fact in later testimony but told Mr. Woody otherwise in an effort to make him more comfortable talking about it. R. Vol. III at 57–59.

---

[3] Mr. Woody also notes that Agent Zuercher "used imperative phrases" to convince Mr. Woody to talk, namely by saying "I gotta know what happened that night." Aplt. Br. at 37, 44. Mr. Woody does not elaborate on how such statements might be coercive, though he does call them "accusatory," Reply Br. at 9. But the district court found that those statements were "spoken gently and politely rather than aggressively or threateningly." R. Vol. I at 416. Consequently, we find that Agent Zuercher's "imperative" statement that the agents needed to know what happened would not have made a reasonable person in Mr. Woody's position feel he was not free to end the encounter.

Nonetheless, we hold that Agent Zuercher's statement that one instance of abuse would be "no big deal" did not turn the consensual conversation into an investigative detention. Certain forms of deception by officers can be indicative of coercion, which would render consent to searches or seizures involuntary under the Fourth Amendment. See United States v. Harrison, 639 F.3d 1273, 1278 (10th Cir. 2011). But "[n]ot all deceit and trickery is improper," id. at 1280; the surrounding circumstances are significant to the analysis, and the operative question is whether "deceit or trickery is used to imply an individual has no ability to refuse consent." Id. For example, in Harrison, the court found that an officer's false suggestion that there might be bombs in the defendant's apartment was coercive and vitiated the defendant's consent to a search of the apartment, because the defendant was left "with two options: (1) deny consent to search and accept the risk that a bomb had been planted in the apartment; or (2) consent to the search"—hardly a choice at all. Id.

In contrast, here, Agent Zuercher falsely telling Mr. Woody that one instance of abuse was "no big deal" did not affect Mr. Woody's ability to decline to talk. Agent Zuercher's only lie was to minimize the consequences of a confession. While this sort of deception may have ultimately induced Mr. Woody to keep talking, its mechanism for doing so was not to make a reasonable person feel he could not terminate the encounter; it was to make a reasonable person feel he had not so much to lose by continuing the encounter and being honest. In fact, depending on the circumstances, a reasonable person might feel freer to decline to speak with police

15

after being told that the alleged crime was "no big deal." This type of lie did not invalidate Mr. Woody's consent. Thus, the "deception" here does not alter our conclusion that the April 25 encounter between Mr. Woody and the FBI agents was consensual and so did not implicate his Fourth Amendment rights.

### B. Motion to Suppress October 23 Statements

In his other motion to suppress denied by the district court, Mr. Woody argued that his October 23, 2018, statements to the FBI agents must be excluded because the agents violated his Fifth Amendment right against self-incrimination.[4] Here there is no genuine and material factual dispute, and we review the district court's legal conclusions de novo, Cook, 599 F.3d at 1213, and affirm the denial of Mr. Woody's motion.

The Fifth Amendment affords citizens the right to remain silent, to have an attorney present, and to be informed of these rights when the individual is both (1) in custody and (2) subject to interrogation by police. Miranda v. Arizona, 384 U.S. 436, 477–79 (1966). There is no dispute here that Mr. Woody was interrogated without an attorney present when he spoke with Agent McCaskill and Agent Zuercher at the state police station on October 23, 2018. Whether Mr. Woody was in custody at that

---

[4] Mr. Woody makes only a cursory mention of the Fourth Amendment as a basis for his claim that the October 23 encounter violated his constitutional rights. Aplt. Br. at 56. But he fails to make any substantive argument related to his Fourth Amendment rights in this section, focusing instead on the application of Miranda and the Fifth Amendment when discussing this encounter. Thus, we find any potential Fourth Amendment arguments about the October 23 encounter waived due to inadequate briefing. See Garrett, 425 F.3d at 841.

16

time is disputed, however.  Assessing whether an individual is in custody is a totality-of-the-circumstances inquiry involving many different factors.  See United States v. Lamy, 521 F.3d 1257, 1259 (10th Cir. 2008).  Though we have substantial doubts that Mr. Woody was in custody at all—which would mean his Fifth Amendment rights never attached—we need not wade into that fact-intensive issue because, even if he was in custody, Mr. Woody plainly waived his Miranda rights before making the incriminating statements at issue.

Citizens can waive their Miranda rights if the waiver is "made 'voluntarily, knowingly, and intelligently.'" Smith v. Mullin, 379 F.3d 919, 932 (10th Cir. 2004) (quoting Miranda, 384 U.S. at 444).  This requires that the waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" based on the totality of the circumstances.  Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010).

In advance of any questioning at the October 23 interrogation, Agent McCaskill displayed and explained a form detailing Mr. Woody's Miranda rights. Agent McCaskill then explicitly asked Mr. Woody if he wanted to answer questions

17

without an attorney present.  When Woody said, "I guess," Agent McCaskill let Woody know that counsel could be appointed for him, but that he needed a clearer answer.  After a second "I guess," which Agent McCaskill again said was insufficient to waive the right, Mr. Woody eventually responded, "I will."  R. Vol. III at 100–02.  This suffices as an unambiguous waiver of his right to an attorney.  Mr. Woody then signed the advice-of-rights form, which contained a formal waiver of all his Miranda rights.[5]

Mr. Woody has not identified any facts that would render his waiver involuntary or unintelligent, nor do we see any in the record.  Agent McCaskill thoroughly explained Mr. Woody's Miranda rights at the very beginning of the interrogation.  There is no allegation of any deficiency in Mr. Woody's mental state or mental capacity.  The agents never threatened to use or used any physical force against Mr. Woody.  Mr. Woody argues only that his two responses of "I guess" to the waiver request, before the unambiguous "I will" response, "rendered the waiver of his Miranda rights invalid."  Aplt. Br. at 55–56.  We are not persuaded.  Clarifying whether the suspect is in fact waiving his rights does not take away from the suspect's ultimate voluntary and intelligent choice to do so; to the contrary, Agent

---

[5] Mr. Woody makes much of the fact that the polygraph examination, for which he signed a separate consent form, never actually occurred.  He notes that he "was never informed that the consent to take a polygraph [was] invalidated."  Aplt. Br. at 54.  But the polygraph consent form was separate from the Miranda advice-of-rights form, and the Miranda form's waiver was not limited in scope to questions asked during the polygraph examination.  Thus, the polygraph consent form and the agents' decision not to carry out the polygraph examination have no bearing on the question of whether Mr. Woody waived his Miranda rights.

McCaskill made every reasonable effort to ensure Mr. Woody's uncoerced willingness to continue with the interrogation here.

Consequently, Mr. Woody's waiver of his Miranda rights at the beginning of the October 23 interview was valid. His Fifth Amendment rights were therefore not violated, and his subsequent incriminating statements were admissible, so we affirm the district court's denial of Mr. Woody's motion to suppress the October 23 statements below.

### C. Admission of Dr. Pilon's Hearsay Statement

At the government's request, the district court admitted testimony about Jane Doe 1's statement to Dr. Pilon in which she identified Mr. Woody as the person who abused her. R. Vol. I at 345–46. Mr. Woody now challenges that evidentiary ruling by the district court, which we review for an abuse of discretion. United States v. Tome, 61 F.3d 1446, 1449 (10th Cir. 1995). "Our review is especially deferential when the challenged ruling concerns the admissibility of evidence that is allegedly hearsay." Id.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Under Fed. R. Evid. 802, hearsay evidence that does not meet an exclusion or exception is generally inadmissible at trial." United States v. Pulido-Jacobo, 377 F.3d 1124, 1132 (10th Cir. 2004) (quotation marks and internal citation omitted). The government does not contest that Dr. Pilon's testimony that Jane Doe 1 told him Mr. Woody abused her was hearsay, under this standard definition. But the government argues, and the

district court agreed, that the testimony was nonetheless admissible under the well-established exception to the hearsay rule for a statement that is "made for—and is reasonably pertinent to—medical diagnosis or treatment" and "describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). The government claims that Jane Doe 1's statement to Dr. Pilon fits this description.

As Mr. Woody argues, "a declarant's statement relating the <u>identity</u> of the person allegedly responsible for her injuries is not ordinarily admissible under Rule 803(4) because statements of identity are not normally thought necessary to promote effective treatment." <u>United States v. Joe</u>, 8 F.3d 1488, 1494 (10th Cir. 1993) (emphasis in original). But in <u>Joe</u>, this court joined other circuits in holding that hearsay testimony as to a "sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes 'reasonably pertinent' to the victim's proper treatment." <u>Id.</u> at 1495. <u>See also</u> <u>Tome</u>, 61 F.3d at 1450.

Here, the district court applied <u>Joe</u>'s rule and held that the identity of Jane Doe 1's abuser was "reasonably pertinent" to her diagnosis and treatment because it was "necessary to determine if [she was] in a safe environment or in danger of being abused again." R. Vol. I at 346 (quoting <u>United States v. Chaco</u>, 801 F. Supp. 2d 1200, 1213 (D.N.M. 2011)). We agree. Mr. Woody was Jane Doe 1's stepfather, a relationship that put him in a position to continue abusing her. Knowing his identity

was necessary for Dr. Pilon to report the abuse to the proper authorities so that it could be investigated and halted.

Mr. Woody argues to the contrary that the sexual abuse occurred too long before the medical examination for the identity of the abuser to be reasonably pertinent, especially because there was no evidence of physical injury, and he also asserts that it was not reasonably pertinent because Jane Doe 1 was not actually living with Mr. Woody at the time of the exam (instead, she was living with her father). But the record indicates that Mr. Woody and Jane Doe 1's mother shared custody of Jane Doe 1 with her father, so there was a good chance Jane Doe 1 would be living with them again eventually, making Mr. Woody's identity pertinent to ending the abuse. The passage of time between the abuse and the medical exam, as well as the lack of any apparent physical injury at the time of the exam, are also irrelevant to the question of whether the abuser's identity was pertinent to Jane Doe 1's treatment or diagnosis here. "All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser." Joe, 8 F.3d at 1494. Physical injuries are therefore not the end-all-be-all of a medical examination of an alleged minor sexual abuse victim. Additionally, the fact that the abuse did not occur within the thirty days prior to the exam did not mean abuse could not occur again in the future, given Mr. Woody's relationship to Jane Doe 1.

Mr. Woody relies on one additional case to argue that Dr. Pilon's testimony about Jane Doe 1's identification of Mr. Woody was inadmissible: United States v.

21

Charley, 189 F.3d 1251 (10th Cir. 1999). In Charley, the court held that the district court abused its discretion in admitting the testimony of an expert witness under Federal Rule of Evidence 702. There, the challenged expert was Dr. Renee Ornelas, who had examined the two girls who were allegedly sexually abused by the defendant. Id. at 1257. The examination occurred approximately two months after the girls had initially disclosed the abuse, and while Dr. Ornelas found no physical evidence of abuse at that time, she nonetheless concluded (and testified at trial) that the girls had been abused based on conversations with the girls and their mother. Id. The court held that Dr. Ornelas's expert opinion that "sexual abuse in fact occurred" was not admissible under Rule 702 because the pediatrician was "merely vouching for the credibility of the alleged victim[s]," which "encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." Id. at 1267.

Mr. Woody argues that, like Dr. Ornelas in Charley, Dr. Pilon here was simply vouching for Jane Doe 1's credibility by testifying to her identification of Mr. Woody as her abuser. But Charley is inapposite for multiple reasons. First, Dr. Pilon was admitted as a fact witness rather than as a Rule 702 expert witness, given that he was the doctor who examined Jane Doe 1 immediately after her disclosure of the abuse to her father. As a result, Rule 702, which deals with expert opinions, does not apply as it did to Dr. Ornelas in Charley. In fact, Dr. Pilon's testimony here is more analogous to that of a different doctor in Charley: Dr. Edward Junkins, the victims' pediatrician, who examined the girls immediately after they disclosed the defendant's

22

abuse to their mother.  Id. at 1256.  At trial, Dr. Junkins testified, "without objection, to the facts of the girls' medical history and treatment, and the facts of his examination," and he repeated "what the girls told him" during that examination.  Id. at 1263.  The court found no issue with the admission of Dr. Junkins' testimony under Rule 803(4), for essentially the same reasons we affirm the admission of Dr. Pilon's testimony here.  Id. at 1263, n. 14 ("Treating professionals may relate statements made to them by the alleged victims, as long as the statements were made for the purposes of diagnosis or treatment.").

Second, unlike Dr. Ornelas in Charley, Dr. Pilon's testimony at issue in this case did not amount to an "unconditional opinion that [the victim] was in fact sexually abused."  Id. at 1266.  Dr. Pilon was merely repeating Jane Doe 1's own statement as a factual matter—hearsay, but admissible hearsay—and so was not "vouching" for her credibility by basing an expert opinion on her statements alone.  Thus, Charley does not support a different result, and we find no abuse of discretion in the district court's admission of Dr. Pilon's testimony as to Jane Doe 1's statements.

### D. Substantive Reasonableness of Sentence

The district court sentenced Mr. Woody to life imprisonment on each of the three counts, run concurrently, rejecting Mr. Woody's request for the statutory minimum sentence of 30 years.  Mr. Woody appeals that sentence as substantively unreasonable.

We review the substantive reasonableness of a sentence for an abuse of discretion and "examine whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Chavez, 723 F.3d 1226, 1233 (10th Cir. 2013) (quotation marks omitted). A sentence is only substantively unreasonable if it "exceed[s] the bounds of permissible choice, given the facts and the applicable law." Id. "Further, we presume a sentence is reasonable if it is within the properly calculated guideline range." Id. Here, the sentence of life was within guideline range properly calculated by the PSR, and so it is Mr. Woody's burden to rebut the presumption of reasonableness. Id.

In its written sentencing opinion, the district court identified twenty-two factors that "put downward pressure on Woody's sentence," including his age and lack of prior incarceration. R. Vol. I at 447. But it also identified fifty-three factors that "put upward pressure to keep Woody's sentence within the Guideline range and give a life sentence." Id. at 450 (quotation marks omitted). Balancing these factors, the district court concluded that the life sentence was "sufficient, but not greater than necessary, to comply with the four purposes that 18 U.S.C. § 3553(a)(2) enumerates." Id. at 457. The only reasons Mr. Woody presents to rebut the presumption that this analysis and resulting sentence were reasonable are: (1) even if Mr. Woody was given his requested thirty-year sentence, he would be eighty-five to ninety years old at the time of his release; (2) Mr. Woody had no prior criminal history other than an arrest for driving while intoxicated; and (3) Mr. Woody does not pose a risk to the

24

public because he would not be living with any young girls upon his release from prison.

Those three facts do not demonstrate that the district court's thorough analysis of the relevant § 3553 factors and subsequent sentence of life was an abuse of discretion. Mr. Woody essentially asks us to redo the § 3553 analysis and reach a different conclusion than the district court. But we find no error in the district court's reasoning and do not second-guess its defensible discretionary assessment of the relevant factors. Thus, on this record, Mr. Woody has failed to rebut the presumption that the sentence was reasonable and we affirm the district court's imposition of a life sentence for Mr. Woody.

## III.   CONCLUSION

Based on the foregoing, we AFFIRM Mr. Woody's conviction on each count and AFFIRM the sentence of life imprisonment on each count, run concurrently.