FILED
United States Court of Appeals
Tenth Circuit

January 13, 2026

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JEREMY DANIEL CHAFIN, a/k/a Jeremy
David Johnston,

    Defendant - Appellee.

No. 24-5079
(D.C. No. 4:24-CR-00008-GKF-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **EID**, and **FEDERICO**, Circuit Judges.
_____

Jeremy Daniel Chafin was indicted for possessing a firearm despite knowing

that he was a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

Before trial, Chafin filed a motion to suppress, arguing that he was placed in an

unjustified investigatory detention when he was approached and questioned by

Officer Tony Morris.  The district court granted Chafin's motion after an evidentiary

hearing.  The government filed a motion to reconsider, which the district court

denied.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

On appeal, the government asserts that the encounter between Chafin and Officer Morris began consensually, rather than as a seizure, until Officer Morris spotted the black, metal object in Chafin's pocket.  The government then claims that Officer Morris had reasonable suspicion that the object was a gun, sufficient to justify seizing Chafin once the encounter evolved into an investigatory detention.

We agree with each of the government's arguments.  Therefore, we hold that the officers' encounter[1] with Chafin did not violate the Fourth Amendment.  Accordingly, we reverse.

## I.

On the afternoon of June 10, 2022, Wyandotte Nation Tribal Police Department Officer Tony Morris was on duty and responding to a complaint at a home in a Wyandotte neighborhood.  Because he was on duty, Officer Morris was in uniform and carrying a sidearm.  While responding to the call, Officer Morris heard several distinctive "popping sounds."  App'x at 39.  Officer Morris—a police officer for twenty-five years and a life-long hunter—identified the popping sounds as .22 caliber gunshots originating from the woods to the north and west.  According to Officer Morris, two gunshots initially rang out and were followed by several additional shots fired in rapid succession.

---

[1] Officer Morris was accompanied by Wyandotte Nation Tribal Police Detective Tracey Reynolds and Wyandotte Tribal Police Chief Ronnie Gilmore, although Officer Morris was the only one who directly interacted with Chafin.

2

In response, Officer Morris left the home, got into his unmarked police car, and drove off in the direction of the shots. He notified dispatch, issued a shots-fired alert, and requested backup. Officer Morris then drove a few blocks west and, within a few minutes, parked in front of a fifth-wheel camper. The door of the camper was open, and it appeared that someone lived in it; Officer Morris knocked on the open door, but no one answered.

As Officer Morris started walking back to his patrol car, Wyandotte Nation Tribal Police Detective Tracey Reynolds arrived, having heard Officer Morris's call for backup. Detective Reynolds was also armed and wearing a uniform, and his patrol car was unmarked as well. Officer Morris explained the situation to Detective Reynolds, including the direction from which he believed the shots originated. The two agreed that the shots likely came from a nearby wooded area, which was north of some railroad tracks that were adjacent to where the officers stood. The officers began discussing whether and how to approach the woods, given that they were the only two officers on the scene.

Just then, the officers observed a man—later identified as Jeremy Daniel Chafin—walking alone on the railroad tracks. Officer Morris later testified that Chafin "came walking out of the woods," crossed the railroad tracks, and "approached" the officers. *Id.* at 94, 127. According to Officer Morris, Chafin was wearing pants but no shirt. Officer Morris did not see a gun on Chafin's person, nor did he see any bulges indicative of a weapon. Chafin was not making any furtive movements, and his demeanor did not otherwise stand out.

3

Officer Morris approached Chafin, while Detective Reynolds stayed back near the patrol cars; at that point, both officers stood between Chafin and the fifth-wheel camper. The camper was later confirmed as belonging to Chafin. Officer Morris did not identify himself, nor did he ask Chafin for identification.

As he approached Chafin, Officer Morris asked, "Where's the .22?" Chafin responded that he did not have a .22. Officer Morris then asked whether Chafin would consent to a search. Chafin did not audibly answer yes or no, but instead responded by "going through his pockets himself." *Id.* at 95. Chafin pulled a pill bottle out of his right pants pocket, and Officer Morris noticed something black and metal in Chafin's pocket. Officer Morris asked Chafin what the object was. In response, Chafin again did not audibly answer and instead pulled out the frame (i.e., the lower portion) of a .22 caliber handgun. Before Officer Morris could ask another question, Chafin pulled out the top portion of the same firearm from his front left pants pocket, showing both halves to Officer Morris.

Chafin then stated—again, before Officer Morris could ask another question— that he had also heard shots from a .22 caliber firearm, had gone into the woods to investigate, and had found the pistol there. He did not attempt to reconcile this story with his initial denial that he had a .22 caliber firearm.

Neither Officer Morris nor Detective Reynolds reached into Chafin's pockets or otherwise physically searched him. Moreover, neither Officer Morris nor Detective Reynolds brandished their weapons at any point during the encounter. The district court also found that Officer Morris's tone of voice throughout the encounter

4

was not loud or threatening. However, neither Officer Morris nor Detective Reynolds advised Chafin that he was free to go or that he did not have to answer questions.

After discovering the .22 caliber pistol in Chafin's pockets, Officer Morris gave the two gun parts to Detective Reynolds. At some point, Wyandotte Tribal Police Chief Ronnie Gilmore also arrived and reportedly recognized Chafin. Officer Morris ran a criminal history check on Chafin and discovered that he was a previously convicted felon. Chafin was then arrested.

A federal grand jury indicted Chafin for possessing the firearm despite knowing that he was a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Before trial could commence, Chafin filed a motion to suppress. He claimed that his encounter with Officer Morris constituted an unjustified investigatory detention. After an evidentiary hearing, the district court granted Chafin's motion. The government subsequently filed a motion to reconsider, which the district court denied.

The government then filed this timely appeal.

## II.

When reviewing a district court's grant of a motion to suppress, "we review factual findings for clear error and legal determinations de novo." *United States v. Daniels*, 101 F.4th 770, 775 (10th Cir. 2024). In conducting our review, we evaluate the evidence "in the light most favorable to the district court's decision." *Id.* (quotation marks omitted) (quoting *United States v. Morales*, 961 F.3d 1086, 1090

(10th Cir. 2020)). Further, we review de novo whether an encounter was consensual under the Fourth Amendment. *United States v. Abdenbi*, 361 F.3d 1282, 1291 (10th Cir. 2004).

Additionally, "[w]hile the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search or seizure under the Fourth Amendment is a question of law reviewed de novo." *United States v. Fonseca*, 744 F.3d 674, 680 (10th Cir. 2014) (quotation marks omitted) (quoting *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009)).

## A.

### 1.

The Fourth Amendment protects "[t]he right of the people" to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. However, "consensual encounters" between law enforcement and citizens "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). Thus, "[a]n officer is free to approach people and ask questions without violating the Fourth Amendment." *Id.* But once an encounter traverses from a consensual interaction to a more restrictive detention, it becomes a seizure within the meaning of the Fourth Amendment and must be supported by some quantum of individualized suspicion of wrongdoing. *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

There are two categories of detentions within the Fourth Amendment: an investigative detention and an arrest. These two "categories are not static and may escalate from one to another." *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012) (quotation marks omitted) (quoting *White*, 584 F.3d at 945). An arrest, which is "characterized by [a] highly intrusive or lengthy search or detention," must be supported by probable cause. *Oliver*, 209 F.3d at 1185 (quotation marks omitted) (quoting *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984)). Meanwhile, an investigative detention (or a *Terry* stop) "unlike an arrest, [ ] need not be supported by probable cause." *Id.* at 1186. Thus, although an investigative detention is still "a seizure within the meaning of the Fourth Amendment," *id.*, "[a]n officer may constitutionally 'stop and briefly detain a person for investigative purposes if the officer has a *reasonable suspicion* supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.'" *United States v. Briggs*, 720 F.3d 1281, 1284–85 (10th Cir. 2013) (emphasis added) (quoting *United States v. Neff*, 681 F.3d 1134, 1137–38 (10th Cir. 2012)).

But, again, an officer needs neither probable cause nor reasonable suspicion to justify a consensual encounter with a citizen. To that end, the Supreme Court has emphasized that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

To determine whether an encounter is consensual, a court "must 'consider all the circumstances surrounding the encounter to determine whether the police conduct

7

would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. Woody*, 45 F.4th 1166, 1173 (10th Cir. 2022) (quoting *Bostick*, 501 U.S. at 439). In other words, "[t]he critical inquiry is whether the police conduct would have communicated to a reasonable person that []he was not at liberty to ignore the police presence and go about [his] business." *Jones*, 701 F.3d at 1313 (alterations in original) (internal quotation marks omitted).

In *United States v. Rogers*, we set out a non-exhaustive list of factors to consider when determining whether an individual has been seized for Fourth Amendment purposes:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

556 F.3d 1130, 1137–38 (10th Cir. 2009).

A court may also consider "whether an officer indicated to the person that he is free to leave." *Jones,* 701 F.3d at 1313. However, it is worth noting that officers are not required to advise suspects of their right to refuse to answer questions or that they are free to leave; thus, the fact that an officer fails to tell a suspect that he is free to leave, without more, is "simply not enough to turn the encounter into an investigative detention." *Woody*, 45 F.4th at 1175.

8

We have previously stated that "the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (quoting *United States v. Lopez*, 443 F.3d 1280, 1284–85 (10th Cir. 2006)).  Still, "no single factor is dispositive," and the ultimate determination is based on the totality of the circumstances.  *Jones*, 701 F.3d at 1313 (citing *Rogers*, 556 F.3d at 1138).

**2.**

In this appeal, the government argues that, under the totality of the circumstances, the encounter between Chafin and Officer Morris "was consensual at least until Officer [Morris] saw the black, metal object in Chafin's pocket."  Aplt. Br. at 21.  Put differently, the government claims that Officer Morris had not seized Chafin at all when he first approached Chafin—nor had Officer Morris seized Chafin when he asked if Chafin had the .22 caliber firearm and would consent to a search. And so, the government asserts, Officer Morris did not need any degree of reasonable suspicion to justify asking those two questions.

We agree.  After examining the *Rogers* factors, we hold that the totality of the circumstances indicates that the initial encounter between Chafin and Officer Morris was consensual.  We discuss each of the eight factors in turn.

*First*, we consider whether there was a threatening presence of several officers. *See Rogers*, 556 F.3d at 1137.  Here, only two officers were present during the initial encounter with Chafin, and only one of these officers—Officer Morris—approached Chafin and asked him questions.  Previously, we established that two officers' mere

9

presence, without more, is not enough to indicate that the encounter began as a nonconsensual seizure. For example, in *Woody*, we noted that "[the defendant] does not contend that two officers were so many as to give a reasonable person the impression that he would be unable to decline their request to speak with them. Nor could he make such a contention, without more." 45 F.4th at 1175. Furthermore, in *Jones*, we concluded that the presence of "three officers on the scene" did not indicate that the defendant was seized, especially because "the officers' presence was non-threatening." 701 F.3d at 1314.

It is true, as Chafin observes, that we have previously deemed an encounter to be a seizure even when only two officers were present. *See Hernandez*, 847 F.3d at 1265–66. But we only did so because, in *Hernandez*, the two officers' conduct was particularly coercive, given that the defendant "was alone at night being closely followed by a police car with two uniformed and armed officers who asked him to stop walking even though he was answering their questions." *Id.* at 1267. Here, by contrast, only Officer Morris actually approached Chafin; as the district court itself noted, Detective Reynolds "was standing 'aways back' of Officer Morris" while the encounter took place. App'x at 40. Therefore, the first *Rogers* factor weighs in favor of the conclusion that the initial encounter between Chafin and Officer Morris began consensually.

*Second*, we ask whether the officers brandished a firearm. *See Rogers*, 556 F.3d at 1137–38. Although both Officer Morris and Detective Reynolds were in uniform and carrying firearms, the district court found that neither brandished his

weapon. We have noted that "the mere 'presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.'" *United States v. Tafuna*, 5 F.4th 1197, 1202–03 (10th Cir. 2021) (quoting *United States v. Drayton*, 536 U.S. 194, 204–05 (2002)). Chafin does not contest that neither officer brandished their weapon. Therefore, the second *Rogers* factor also indicates that Chafin and Officer Morris's initial encounter began consensually.

*Third*, we consider whether there was physical touching by an officer. *See Rogers*, 556 F.3d at 1138. The district court found that the officers did not physically touch or restrain Chafin at all during the encounter. Chafin does not dispute this. As a result, the third *Rogers* factor also weighs in favor of the conclusion that Chafin and Officer Morris's initial encounter began consensually.

*Fourth*, we ask if there was "aggressive language or tone of voice by an officer indicating compliance is compulsory." *Id*. Here, although the district court expressly found that Officer Morris did not act aggressively during his encounter with Chafin, it nevertheless found that he had an "authoritative" presence, based only on Officer Morris's "general tone and demeanor." App'x at 77. Likewise, because of Officer Morris's generally authoritative demeanor, the district court concluded that his initial questions were overly "accusatory, persistent, and intrusive." *Id*. Therefore, the district court concluded that this factor weighed in favor of the conclusion that the encounter between Chafin and Officer Morris began as an investigative detention.

11

This is incorrect.  To be sure, we have acknowledged that "'[a]ccusatory, persistent, and intrusive' questioning can turn an otherwise voluntary encounter into a coercive one."  *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) (quoting *Bostick*, 501 U.S. at 437).  However, we have also made clear that a "single statement"—even an accusatory one—is not sufficient to transform a consensual encounter into a Fourth Amendment seizure.  *Jones*, 701 F.3d at 1314.  That is especially true when the questioning is "not part of a series of accusatory remarks," *id.*, and when an otherwise-accusatory question is "spoken in an ordinary tone of voice," *United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006).

Here, consistent with the district court's factual findings, Officer Morris asked two brief questions—only one of which was arguably accusatory, which concerned whether Chafin had a .22 firearm—and Officer Morris did so in an ordinary tone of voice, without an aggressive demeanor.  Accordingly, even if Officer Morris had an authoritative demeanor in general, the record does not support the conclusion that he used an aggressive tone of voice during the encounter that compelled Chafin's compliance.  *See United States v. Esparza-Mendoza*, 386 F.3d 953, 959 (10th Cir. 2004) (focusing on whether an officer "exhibited an intimidating or coercive demeanor" during the encounter itself).  Therefore, the fourth *Rogers* factor also

weighs in favor of the conclusion that Officer Morris's encounter with Chafin began consensually.[2]

*Fifth*, we consider whether there was prolonged retention of an individual's personal effects. *See Rogers*, 556 F.3d at 1138. The district court found that Officer Morris did not take or retain any of Chafin's personal effects until the end of the encounter. As a result, the fifth *Rogers* factor also indicates that Chafin and Officer Morris's encounter began consensually.

*Sixth*, we ask whether there was a request to accompany an officer to the police station. *See id*. The government notes that Officer Morris did not ask Chafin to go to the police station at any point. Therefore, the sixth *Rogers* factor also supports the conclusion that Officer Morris's encounter with Chafin began consensually.

*Seventh*, we consider whether the interaction took place in a small, enclosed, or non-public place. *See id*. In this case, the district court never found that the location of the encounter was non-public or that it was somehow enclosed, but it described the area as "isolated." App'x at 78. Here, we note that the encounter did not occur in the type of enclosed, private location where courts have generally found seizures to occur; for instance, the encounter did not take place in a police station or an interrogation room, *see Florida v. Royer*, 460 U.S. 491, 501 (1983), or in a private

---

[2] Judge Federico would afford more deference to the district court's findings and observations of Officer Morris during his testimony and weigh this factor in favor of Chafin.

location like a home, *see Woody*, 45 F.4th at 1174.  Instead, the entire encounter occurred outside, in the open, public space between the officers' vehicles, Chafin's camper, the railroad tracks, and the woods.  Thus, the setting of the encounter supports the conclusion that the encounter between Officer Morris and Chafin began consensually.

*Eighth*, we ask whether the interaction took place without other members of the public present.  *See Rogers*, 556 F.3d at 1138.  No member of the public ever passed by, so this is the only *Rogers* factor that weighs in favor of the conclusion that the encounter between Officer Morris and Chafin began as an investigatory detention.

However, Chafin argues that there are several other reasons that his encounter with Officer Morris did not begin consensually.  First, the officers never informed him "that he was free to go or [could] decline to speak to them."  Aple. Br. at 12–13.  But the mere fact that the officers failed to tell Chafin that he was free to terminate the encounter, on its own, is "simply not enough to turn the encounter into an investigative detention."  *Woody*, 45 F.4th at 1175.

Second, Chafin stresses that the officers stood in between him and his home, the fifth-wheel trailer, and he suggests that the officers' act of "[i]mpeding [his] ability to go home" amounted to a restraint on his freedom of movement.  Aple. Br. at 17.  Thus, according to Chafin, the fact that he was unable "to reasonably get to his home except through armed officers" indicates that the encounter was a nonconsensual seizure.  *Id.*  The district court agreed with Chafin and, citing our decision in *United States v. Ringold*, 335 F.3d 1168, 1173 (10th Cir. 2003),

14

concluded that because Chafin's path to his home was impeded, he would not have felt free to terminate his encounter with the officers.

We disagree. In *Ringold*, a group of officers approached a suspect at a gas station, positioning themselves "in such a way that [the defendant] was encircled between them, the gas pump and his vehicle." 335 F.3d at 1173. Even so, we concluded that fact did not transform the encounter into a seizure because, notwithstanding that the defendant would have to go through the officers, "nothing [actually] prevented [him] from simply entering his vehicle and driving away." *Id.* Here, to be sure, Officer Morris and Detective Reynolds did impede Chafin's path home to some degree; for example, Officer Morris testified that he "suppose[d]" that the only way Chafin would have been able to "get from where [h]e was on the railroad tracks back to his camper was to go through" or "around" the two officers. App'x at 114. But, as in *Ringold*, that fact does not mean the encounter necessarily became coercive enough to constitute a seizure. At no point did Officer Morris indicate that Chafin could only continue walking or return to his camper if he agreed to answer questions or consent to a search. Nor did Chafin even attempt to keep walking toward his camper. Thus, all considered, the officers' positioning between Chafin and his home has little bearing on whether the encounter was a seizure.

Taken together, the *Rogers* factors strongly indicate that the encounter between Officer Morris and Chafin began consensually—and remained consensual at least while Officer Morris asked Chafin his first two questions. Even accepting all of the district court's factual findings, we cannot conclude that Officer Morris seized

15

Chafin at any point before he observed the black, metal object in Chafin's pocket. Because the encounter began consensually, Officer Morris did not need reasonable suspicion to ask his first two questions. The district court therefore erred in concluding otherwise.

Thus, we next turn to whether Officer Morris had reasonable suspicion that Chafin had a gun, sufficient to justify seizing Chafin once the encounter evolved into an investigatory detention.

**B.**

**1.**

The Supreme Court has held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22. In other words, the Fourth Amendment permits temporary detentions of individuals—so long as "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]" *Id.* at 21–22.

To be "reasonable," a police officer's investigatory stop must be "justified at its inception," and the "officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013) (quotation marks omitted) (quoting *Terry*, 392 U.S. at 20). This appeal concerns only the first prong—that is, whether Officer Morris's detention of Chafin was justified at its inception.

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (quotation marks omitted) (quoting *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir 2009.)).  Importantly, "the likelihood of criminal activity need not rise to the level required for probable cause." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  But officers cannot rely on "inchoate and unparticularized suspicion[s] or hunch[es]," because "the Fourth Amendment requires some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (cleaned up).  Notably, reasonable suspicion does not require suspicion of a particular criminal offense. *See United States v. Guardado*, 699 F.3d 1220, 1225 (10th Cir. 2012) ("Direct evidence of a specific, particular crime is unnecessary [for reasonable suspicion to be present].").

To determine whether a detaining officer had the required "particularized and objective basis for suspecting [a] particular person stopped of criminal activity," we consider the "totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  And, when making that determination, "a court may not evaluate and reject each factor in isolation." *Madrid*, 713 F.3d at 1256 (quotation marks omitted) (quoting *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003)).  Indeed, "[c]onduct that may be wholly innocent may nonetheless support a finding of reasonable suspicion in certain circumstances." *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004).  All factors,

17

"mitigating and aggravating," must be considered in the totality of the circumstances. *Id.* at 1193.

**2.**

In this appeal, the government claims that Officer Morris had reasonable suspicion that Chafin had a gun, sufficient to justify seizing Chafin once the encounter evolved into an investigatory detention.

The government is correct. Despite Chafin's claim to the contrary, there are several reasons that support the conclusion that Officer Morris had a reasonable basis to believe that the black, metal object in Chafin's pocket was a firearm.

First, the totality-of-the-circumstances test for reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Arvizu*, 534 U.S. at 273. Here, Officer Morris could infer that the object was a firearm based on his own experience as a longtime police officer and lifelong hunter.

Second, Officer Morris had good reason to suspect that it was Chafin, in particular, who had fired the shots. Officer Morris and Detective Reynolds observed Chafin emerge out of the wooded area where the shots had been fired, and although Officer Morris testified that he did not actually witness Chafin "exit the woods," he did see that Chafin had "come up from [the woods] onto the tracks." App'x at 111. In other words, although Officer Morris may not have seen Chafin walking out of the woods, Officer Morris could still have logically deduced that Chafin was leaving the woods based on the direction from which Chafin walked onto the railroad tracks.

18

Additionally, no one else was in the area at the time, making it more likely that Chafin was the one who had fired the shots. Thus, Officer Morris's observation of Chafin walking alone onto the railroad track, from the direction of the wooded area where the shots had been fired, gave Officer Morris reason to connect Chafin to the suspected criminal activity.

Third, Officer Morris had reason to suspect "in light of his experience[,] that criminal activity may [have been] afoot" and that Chafin was "armed and presently dangerous." *Terry*, 392 U.S. at 30. As we have already established, Officer Morris observed Chafin emerge alone from the direction of the shots. Additionally, Chafin initially denied having a gun in response to Officer Morris's first question—"where's the .22?"—and Officer Morris almost immediately thereafter saw an object resembling a .22. App'x at 40. The district court declined to consider Chafin's initial denial, concluding that it could not support reasonable suspicion because Chafin only denied having a gun "after the initiation of the investigatory stop." App'x at 82. But that position rests on the faulty premise that the encounter began as an investigatory stop; as explained above, the encounter began consensually and did not evolve into an investigatory stop until the moment Officer Morris saw the metal object in Chafin's pocket.

Moreover, the district court's position overlooks the fact that Officer Morris suspected Chafin not only of *carrying* the firearm, but discharging it as well— conduct that itself could have been unlawful under the laws of whichever locality actually controlled the wooded area. Reasonable suspicion generally does not require

19

suspicion of a *particular* crime or violation, so long as there is a particularized basis to suspect an individual of criminal activity more generally.  Likewise, any particular fact to which the government points in establishing reasonable suspicion need not "by itself [be] proof of any illegal conduct."  *Sokolow*, 490 U.S. at 9.  Even a fact or circumstance that by itself is "consistent with innocent" conduct may still contribute to reasonable suspicion when "taken together" with other facts.  *Id.*  With that in mind, the fact that Chafin initially denied having a .22 caliber pistol, but then revealed the weapon in his pocket, gave Officer Morris reason to suspect not only that "criminal activity may [have been] afoot," but also that Chafin was "armed and presently dangerous."  *Terry*, 392 U.S. at 30.

As a result, the record demonstrates that Officer Morris developed reasonable suspicion at the moment that the encounter evolved from a consensual one into an investigatory detention.  Officer Morris's seizure of Chafin therefore did not violate the Fourth Amendment.  Accordingly, we reverse the district court's grant of Chafin's motion to suppress.

### III.

For the foregoing reasons, we REVERSE.

Entered for the Court

Allison H. Eid
Circuit Judge